In re Dennis N. BEAUSOLEIL, Lenette
M. Beausoleil, Debtors.

Matthew J. McGOWAN,
Trustee, Plaintiff,

v.

Dennis N. BEAUSOLEIL, Lenette
M. Beausoleil, Defendants.

Bankruptcy No. 89–10829.
Adv. No. 90–1033.

United States Bankruptcy Court,
D. Rhode Island.

June 18, 1992.

**32**

Paul DeMarco, Cuzzone, Geremia & Civittolo, Providence, R.I., for debtors, defendants.

Matthew J. McGowan, Salter, McGowan, Swartz & Adden, Inc., Providence, R.I., Trustee.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Before the Court is the Chapter 7 Trustee's Complaint Objecting to Debtors' Discharge Under Bankruptcy Code § 723(a). The issues presented for determination, based on 11 U.S.C. §§ 727(a)(4)(A), (a)(5), or (a)(7), are: (1) whether the Debtors have failed to satisfactorily explain the loss or transfer of a substantial portion of their personal property over the four months prior to the petition date; (2) whether by not listing their legal or equitable interests in at least seven business entities, the Debtors failed to fully and properly disclose all partnership or other business interests of Debtors for six years prior to the petition date; (3) whether the Debtors are guilty of a failure to disclose all their assets and sources of income; and (4) whether Debtor Dennis N. Beausoleil, as an insider of Pub Dennis International, Inc. ("PDI"), also a Chapter 7 debtor, committed acts specified in one or more of paragraphs (2), (3), (4), (5), and (6) of 11 U.S.C. § 727(a) in connection with the PDI case, by selectively treating corporate assets as if they were personal assets, and vice versa.

## FACTUAL BACKGROUND

Until his financial problems surfaced publicly, Dennis Beausoleil appeared to be a highly successful restauranteur, with business interests located throughout Southern New England. His involvement with the hospitality industry began in the late 1970s, when he developed the concept of "warehouse" style discount liquor stores, which were operated in Rhode Island and Massachusetts. In the nineteen-eighties, he gave his name to the "Pub Dennis" chain of informal family restaurants. The original "Pub Dennis" was founded in 1985 by four partners: Dennis Beausoleil, his brother Craig Beausoleil, Richard Arpin, and Ray Bishop. In 1987, the partnership was dissolved, and each partner was ostensibly allocated an undivided interest in one or more restaurants. Dennis Beausoleil retained Pub Dennis International, Inc., which was the management company for the Pub Dennis franchises. According to Beausoleil, he did not realize until several years later that the stock transfers corresponding to the partnership dissolution were never completed by his lawyers, so his name remained as a shareholder and officer of record on the books of the other corporations.

Beausoleil expanded his business through the sale of so-called "turnkey operation" franchises, as follows: PDI would obtain a site, establish the new restaurant as a separate corporation, obtain permits and financing for the construction or remodeling of the physical plant, secure a liquor license, and transfer the stock and assets of the corporation to the franchisee for a set price, plus a 3% royalty. Approximately 26 restaurants were sold in this fashion. PDI's corporate offices were at 239 Park East Drive, Woonsocket, Rhode Island, and at the height of his success Beausoleil employed 85 people, including in-house attorneys and accountants.

PDI filed a petition for reorganization on September 7, 1989, and on January 7, 1990 the case was converted to one under Chapter 7. Mr. and Mrs. Beausoleil filed for personal bankruptcy in September 1989, using forms for debtors not engaged in business.

On Exhibit A to Debtors' Statement of Financial Affairs, entitled "Partnership Involvements of Dennis N. Beausoleil," he indicates the existence, but not the extent or value of interests in the following entities: Pub Dennis of Lowell, Inc.; Pub Dennis of North Attleboro, Inc.; Northeastern Recycling; and Pub Dennis of Warren, Inc.[1]

On their Schedule B–2, the Debtors listed a 44% ownership interest in PDI (which they identified, correctly, as a corporation rather than a partnership) with no market value as of September 7, 1989. They failed, however, to disclose interests in seven other entities: Guardian Realty Trust, Metacom Associates, The Old Pike Pub, Inc., Ah–Roma Family Restaurant, Inc., DNB Food Service, Inc., Pub Dennis of Seekonk, Inc., and Beau Realty. Mr. Beausoleil has provided assorted and not particularly consistent excuses for his failure to list ownership interests in these businesses. The pattern of his disclosures and omissions suggests that he only listed interests in business which existed and had value at the time the petition was filed. He (or his attorneys) simply disregarded the Code's six-year "reach back." His explanation as to these omissions is summarized as follows:

a. Guardian Realty. Dennis Beausoleil was the sole beneficiary of Guardian Realty Trust ("GRT"), a Massachusetts "pass-through" trust that had owned two pieces of real estate: the corporate headquarters in Woonsocket, Rhode Island, valued at $1.8 million, which was sold at foreclosure in August, 1989 by Eastland Bank, and the Pub Dennis of Lowell property, whose sale to the franchisees was delayed by a fire in 1986. As of the date the petition was filed,

Guardian owned neither property. Litigation is pending in State court against an insurer regarding the Lowell fire.

According to Dennis Beausoleil, his Rhode Island bankruptcy attorney wanted to file a separate petition for GRT, and had prepared the initial paperwork, but Beausoleil's Massachusetts in-house counsel (who was the trustee of GRT) advised that this was not necessary, and so Beausoleil scheduled the trust's liabilities as his personal obligation, without disclosing the beneficial interest.

b. Metacom Associates. This was a typical franchise plan that went awry. After Beausoleil had completed the set-up of the Warren Pub Dennis franchise, via Metacom Associates, Marquette Credit Union (the purchasers' lender) discovered a hazardous waste problem on the premises and refused to close the loan unless Metacom Associates executed a $200,000 guaranty of the purchasers' note. In 1987 Metacom Associates filed for reorganization. Its stock was purchased by one David Freedman, an outside investor, and Beausoleil asserts that he had no financial involvement in this entity by 1989.

c. DNB Food Service, Inc. This was the predecessor corporation to Pub Dennis Peabody. Beausoleil and Robert Sriberg incorporated the business in May 1987, and transferred it to the franchisees for $500,-000 in January 1988.

d. Ah–Roma Family Restaurant, Inc. Debtor denies ever having had an ownership interest; the original shareholders, who procured construction financing, were Karen Laferte (Beausoleil's secretary) and Eugene Beausoleil (his father). Debtor was involved as general manager, as a director, and as recipient of franchise fees; he was listed as a director on the certificate of incorporation "because I started it" but "wasn't on any of the loans." It was transferred to a Mr. and Mrs. Lazarus, as franchisees, in January 1987. Debtor testified that he considered, but did not consummate a sale of the "Ah–Roma" name and

---

1. The first three entities are Massachusetts corporations, and the fourth is a Rhode Island corporation. We may only speculate that Debt-

or or his attorneys construed "partnership" to mean any business owned jointly by the Debtor with one or more entities.

restaurant concept to Janco, a large restaurant holding company. (Plaintiff's Exhibit 27 is an undated, handwritten letter from Leslie Rich, an officer of Janco, Inc., to Nicholas Janikes, the principal of Janco, that states "Janco could purchase Ah-Roma free and clear tomorrow for $50,-000.")

e. Beau Realty was a real estate holding company. Debtor was unsure, in his earlier testimony, which "Beau Realty" was at issue, as he had incorporated entities under that name in Rhode Island, Massachusetts and Connecticut. After concluding that the Trustee was inquiring about Beau Realty of Massachusetts, Debtor explained that that entity was incorporated in 1978 to hold two adjacent parcels of land owned by Beausoleil, who had been operating a liquor store on one of the parcels. On his attorney's advice he formed the corporation to shield him from potential dram shop act lawsuits, but he never transferred the real estate to the corporation. The record does not disclose the present ownership of the land. Beausoleil subsequently sold the store; the corporation remained inactive.

f. Emprise Food Service was set up in 1985 to organize a restaurant that, in 1987, was sold to James Malek, the Controller of PDI, and two outside investors.

g. Pub Dennis Seekonk was "the same deal ... we opened the corporation, purchased (the building) in 1986. It took us a year to restore ... It had already been transferred to (the franchisees) when it opened. We never ran it from day one. Never opened the door."

Debtor's ongoing relation with other business entities was extensively inquired into at the hearing. For example, see Plaintiff's Exhibit 12—a check in the amount of $5,000, drawn on the account of Old Pike Pub, Inc., payable to Fogarty Memorial Hospital and signed by Beausoleil on December 15, 1989, three months after the filing date of the instant petition.

Debtor does not deny his involvement with any of these entities during the six-year period prior to filing, but stresses that he had divested himself of all proprietary interests in them before filing his personal Chapter 7. When asked why he identified himself on his petition as a Debtor not engaged in business, he explained that he believed that his business interests were the subject of the PDI case. When confronted with the Code's six-year disclosure provision, he agreed that the information was incorrect, but said that he had deferred completely to the advice of his attorneys in the preparation of his petition and schedules. In light of the Debtor's prior hands-on approach to the management of his business affairs (and his signed declaration as to the accuracy of his attorneys' work product), we reject this unconvincing explanation.

### The Missing Assets

The Plaintiff introduced as Exhibits 3, 5 and 27, financial statements prepared on behalf of Debtor and his wife from information they supplied to an accounting firm in Woonsocket, Rhode Island, in 1986, 1987, and 1989. On May 17, 1989, Debtors provided a personal financial statement to a bank (Exhibit 3), on which they listed personal and household assets worth $75,000, and represented that they owned artwork having a value of $75,000. Less than four months later, in their petition filed on or about September 7, 1989, the Debtors listed personal property and household goods valued at $9,000, and made no mention of an art collection. The Debtors' interest in over $3,000,000 in various entities which were listed on the 1987 financial statement (Exhibit 5) appear nowhere in the Debtors' 1989 Statement of Assets and Liabilities. Mr. Beausoleil blamed the discrepancies on the preparer of the financial statements, who, he said, simply copied the previous year's entries, without verifying them. We note, however, that there are differences in format and content between the financial reports which do not support this explanation.

The Debtor also claims that two thefts occurred in November 1987 and March 1988 that reduced the value of his personal property by $66,000. Two Rolex watches, worth $35,000 and $29,000, respectively, and other jewelry and cameras were alleg-

edly stolen from the Debtors' house. The thefts were allegedly investigated by the North Smithfield and Rhode Island State Police Departments, and the first theft eventually was determined to have been the act of "a drug crazed relative;" the second was an inside job by workers installing a security system at Debtors' home. No arrests were made. Plaintiff testified that there were no insurance policies covering the stolen goods, and therefore there were no claims reports documenting either theft.

Plaintiff introduced a letter written by Beausoleil to Plaintiff that alluded to the thefts and referred to, but did not include, the police report. Despite broad hints from the Court that it would be most advisable to do so, Debtor failed to introduce any official record of the thefts ever being reported to anyone. Instead, the Debtor suggested that if he wanted it, the Plaintiff could obtain the record from the North Smithfield police department.

The art collection was omitted from the bankruptcy filing because Beausoleil considered it an asset of PDI. He did not offer a reason for its recharacterization as a business asset. Plaintiff stated that as of the date of the hearing, the only assets in the estate were $2,000 recovered as a preference from Raymond Bourque.

### Keeping Up Payments

On direct examination, Beausoleil testified that he no longer had an interest in the three homes or the Mercedes automobile listed on the petition, explaining that after failing to receive payments for two years, his secured lenders had all pursued their remedies. The Florida home had been the subject of a foreclosure action four months before the hearing; two months earlier, the automobile was repossessed; and, on the hearing date, the Debtors' Rhode Island home and his father's next-door residence were being sold at auction.

Debtor was vague about the source of his daughters' private school tuition payments. His younger daughter is still attending The Wheeler School, in Providence, and his elder daughter is a sophomore at West Virginia Wesleyan. He testified that she had raised a substantial amount of the first year's tuition at a high school graduation party hosted by her parents, had received a scholarship from her high school, inherited five or six thousand dollars from her grandparents, took a loan against an insurance policy, and cashed in a Merrill Lynch brokerage account. The other daughter had also cashed in her brokerage account to pay school fees, he testified.

### Insider Transactions with PDI

Beausoleil was unable to explain his reasons for undertaking various actions in his own name rather than that of PDI, and claimed to be oblivious to the difference between personal and corporate activity. For example, while he listed $75,000 worth of artwork as an asset in his 1989 personal financial statement, in his Answer to the Trustee's complaint he stated that the artwork was omitted from his personal bankruptcy because it belonged to PDI.

Exhibits 34 and 35, which purport to be a bill of sale to Janco in the amount of $10,400, and a list of the property allegedly sold to Janco, Inc., show that the seller was initially PDI; PDI was subsequently scratched out and Debtor's name was written over it. Beausoleil testified that he did not alter the bill of sale, did not sign it, and had no idea of who had done so. He stated that PDI had always owned the property, which consisted of the furnishings in its executive suite and some decorative items (a miniature carousel and ferris wheel) from closed restaurants. At the time of the transfer, Nicholas Janikes, a major creditor of PDI, had a security interest in all of PDI's assets, and had physical possession of all items listed in the bill of sale (which states that they were in Janikes' basement). Beausoleil implied (but would not unequivocally state) that the sale was actually a foreclosure on collateral, with the "sale" price representing funds advanced by the secured party to reduce Debtor's home mortgage arrearage. He did not introduce any written evidence, such as a UCC filing, of Janikes' secured creditor status, nor did he produce evidence of any kind in support of this contention.

Mr. Beausoleil is a glib, but not a candid witness. On credibility issues, in each instance where Dennis Beausoleil's position differs from that of the Trustee, that question is resolved in favor of the Plaintiff.

## DISCUSSION

▮ Based on the foregoing facts, as established at the hearing, the Plaintiff argues that the Debtors' discharge must be denied based on 11 U.S.C. §§ 727(a)(2), (3), (4), (5) and (7). These sections provide as follows:

(a) The court shall grant the debtor a discharge, unless—

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed . . . —

(A) property of the debtor, within one year before the date of the filing of the petition; or

. . . .

(b) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

. . . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

. . . .

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5) or (6) of this title or under the Bankruptcy Act, concerning an insider.[2]

Under § 727, the objecting party has the burden of proving that the debtor should be denied a discharge. FED.R.BANKR.P. 4005; *In re Bernstein*, 78 B.R. 619 (S.D.Fla.1987). As noted by the Supreme Court in the case of *Grogan v. Garner*, 498 U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), this burden is a mere preponderance of the evidence, at least for complaints based on § 727(a)(4).

It is undisputed that Debtors failed to disclose their involvement with any of the businesses listed above. Nor did they disclose Dennis Beausoleil's status as the sole beneficiary of the Guardian Realty Trust. Likewise, the Debtors failed to disclose on their B–2 Schedule of Personal Property filed in this case, their ownership of stock in those businesses or business assets, including artwork and furnishings.

Besides failing to disclose their ownership interests in the businesses described above, or their beneficial interest in the Guardian Realty Trust, the Debtors failed to disclose several bank accounts maintained by them in their own names and in the name of Pub Dennis International, from which they paid personal expenses before and after the bankruptcy filing.

As Judge Paskay stated in the case of *In re Urban*, 130 B.R. 340 (Bankr.M.D.Fla. 1991):

[T]here is no question that the Statement of Financial Affairs and Schedules of Assets and Liabilities serve the important purpose of insuring that adequate information is available for the Trustee and creditors without need for investigation to determine whether the information provided is true. Even if undisclosed assets are worthless or unavailable to creditors, a debtor has an obli-

---

**2.** "Insider" is defined in the Code as meaning, with respect to a debtor who is an individual, either—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner (iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control.

gation to make full disclosure. The subject matter of a false oath is "material" if it bears a relationship to the debtor's business transactions or assets. There is no question that deliberate omissions warrant a denial of the debtor's discharge. Likewise, when a debtor makes numerous omissions from his Statement of Affairs and Schedules, the omissions together may constitute a pattern demonstrating a reckless disregard for the truth.

*Id.* at 344.

These principles apply equally where a debtor engages in these types of behavior in connection with an entity of which he is an insider.

Applying these principles to the facts in this case, we are satisfied that the Plaintiff has met his burden of proof that Dennis Beausoleil's discharge should be denied under § 727(a)(4)(A). There is absolutely no question that Mr. Beausoleil failed to disclose his affiliation and ownership interests in numerous restaurant corporations, "partnerships" and real estate ventures. Further, he failed to disclose several bank accounts and his ownership interest, through the Guardian Real Estate Trust, of two parcels of real estate. In sum, the magnitude of the omissions from his Schedules and Statement of Financial Affairs evidences at best a gross disregard for the truth, but more likely a deliberate concealment. Either is sufficient to bar a discharge.

■ This Court is also satisfied that the Plaintiff has met his burden of proof under §§ 727(a)(3) and (a)(5), with respect to Dennis Beausoleil. When a debtor's right to discharge is challenged under that section, the initial burden to establish that the debtor's discharge should be denied is on the objecting creditor. Thereafter, the burden shifts to the debtor who must, under § 727(a)(3), establish either that the debtor maintained adequate books and records from which his financial condition could be ascertained, or that the failure to keep adequate books and records was justified under the circumstances. *In re Goblick*, 93 B.R. 771 (Bankr.M.D.Fla.1988); *In re Esposito*, 44 B.R. 817 (Bankr.S.D.N.Y. 1984). Under § 727(a)(5), once it is shown that the debtor had a cognizable ownership interest in a specific identifiable property at a time not too far removed from the date of filing his petition, the burden is on the debtor to satisfactorily explain the loss of that particular asset, if at the time the petition is filed, the debtor claims he no longer has the particular property. *In re Chalik*, 748 F.2d 616 (11th Cir.1984). To pass muster, the explanation must be sufficiently reasonable to satisfy the trier of fact. *In re Urban*, 130 B.R. at 345.

■ This record leaves no doubt that, despite his lack of a formal education, and insistence that he is not a "detail man," Mr. Beausoleil possesses a shrewd intelligence, a vast (but selective) memory for details, and many years of experience in the restaurant and franchising fields. While it is true that the duty to keep books and records is not absolute and depends on the circumstances, it is equally true that one with business dealings as extensive as this Debtor should have records from which his financial condition and holdings could be ascertained with a reasonable measure of certainty. Dennis Beausoleil has failed totally to explain the loss of assets or the absence of records. Not surprisingly, he also failed to satisfactorily explain the discrepancies between the May 1989 financial statements and the Statement of Financial Condition he signed in August of that year. At a minimum, he should have introduced some official record of the alleged thefts from his home; testimony of his in-house counsel and his outside accounting firm; and documentary evidence of the true state of his involvement (or lack of same) with the six corporations listed above. His attempt to place all of the fault upon people working for him fails, in light of his business sophistication and general experience. Even if one were to disagree with our across-the-board rejection of Dennis Beausoleil's testimony, this is a classic "totality of the circumstances" case where the evidence is overwhelming against the Debtor, even giving him credit for being correct here and there. Under the circumstances,

**38**

this Court is satisfied that Mr. Beausoleil's discharge must be denied under § 727(a)(3).

However, as to Mrs. Beausoleil, the Court is on less sure ground.[3] By failing to testify at the hearing on this matter, she failed to sustain her burden of proof under §§ 727(a)(3) and (a)(5). Her husband offered conflicting reasons for her absence. In the morning, counsel stated that repeated requests had been made for an alternative hearing date because the trial was set for the same date as the foreclosure sale of Debtor's home, and Mrs. Beausoleil needed to "supervise" the sale that morning. She was still absent when the hearing reconvened after lunch. Following the Court's suggestion to Mr. Beausoleil that he should call and urge her attendance, Mr. Beausoleil stated that she was unreachable, at his express request. He had told her to drive his aged parents—whose home was also on the auction block that day, as a result of their son's debts—out to Cape Cod for the day, to distract them from its painful events.

Had Mrs. Beausoleil appeared, she would have had the opportunity to explain the discrepancies between her bankruptcy petition, which she signed under oath, and the May, 1989 financial statement. The petition states her occupation as "housewife," and her income during the two years preceding its filing as zero. We find no reason to disbelieve her, as her husband's testimony as well as the Plaintiff's exhibits show that she had little or no involvement in the Pub Dennis empire. Her debts are limited to the mortgages on the family home and certain unsecured consumer loans and charge accounts, plus guaranteeing one restaurant-related loan. However, by freely choosing not to testify, she has squandered her eligibility for discharge of these debts.

In sum, this Court is satisfied that although the record does not call for the denial of Lenette Beausoleil's discharge under §§ 727(a)(3) or (a)(5), it does clearly warrant denying the discharge of both

Dennis and Lenette Beausoleil under § 727(a)(4), and denying Dennis Beausoleil's discharge under §§ 727(a)(3), (a)(5), and (a)(7), and it is so ORDERED.

---

**3.** Debtors' Petition describes Debtor Lenette Beausoleil's occupation as "housewife," and Plaintiff's 40 exhibits support the conclusion that, other than signing as a guarantor of the Guardian Realty Trust's debt to Benjamin Franklin Savings Bank, Mrs. Beausoleil was neither employed by nor an active participant in her husband's "pub" empire.