**In re Elliot COOK, Debtor.**

**PYRAMID TECHNOLOGY CORPORATION,
Plaintiff,**

v.

**Elliot COOK, Defendant.**

**Bankruptcy No. 91–16511S.
Adv. No. 92–0243S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 12, 1992.

Michael A. Cibik, Philadelphia, Pa., for debtor.

Richard Brown, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for plaintiff.

Charles C. Coyne, Philadelphia, Pa., trustee.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding is another prime exhibit in making the case that proceedings attacking a debtor's discharge under 11 U.S.C. §§ 727(a)(3) or (particularly, in this case) 727(a)(5)—which require no showing of a debtor's intent in acting or failing to act—are far more readily sustainable than not only proceedings attacking a discharge under 11 U.S.C. §§ 727(a)(2) or 727(a)(4), but also proceedings attacking only the dischargeability of a specific debt under 11 U.S.C. § 523(a). *Compare In re Cohen,* 142 B.R. 720 (Bankr.E.D.Pa.1992); *In re Henderson,* 134 B.R. 147, 155–162 (Bankr. E.D.Pa.1991); and *In re Trinsey,* 114 B.R. 86, 90 (Bankr.E.D.Pa.1990) (denial of discharge based upon §§ 727(a)(2) and 727(a)(4) refused); and *Henderson, supra,* 134 B.R. at 162–65 (denial of dischargeability under 11 U.S.C. § 523(a) also fails); *with In re Goldstein,* 123 B.R. 514, 521–26 (Bankr.E.D.Pa.1991); and *Trinsey, supra,* 114 B.R. at 90–92 (denial of discharge under §§ 727(a)(3) and/or 727(a)(5) sustained). We recognize that this conclusion is, in one sense, anomalous, because denying a debtor a discharge in circumstances where nondischargeability could not be sustained is a questionable policy. *See In re Woerner,* 66 B.R. 964, 972 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 86–7324 (E.D.Pa. April 28, 1987) (noting that it is illogical to make it easier to successfully attack a debtor's discharge than dischargeability of particular debts). It is justifiable only when one considers that a debtor's complete disclosure of financial affairs, which is the common principle behind §§ 727(a)(3) and 727(a)(5), is fundamental to the concept that a bankruptcy

discharge is only available to totally open and honest debtors.

In this proceeding, we conclude that the Plaintiff has sustained its burden, under § 727(a)(5), of establishing that the Debtor failed to satisfactorily explain the loss of significant assets. We emphasize this cause of action because a decision that discharge must be denied on this one ground renders consideration of other grounds for denial of discharge as well as the issue of denial of dischargeability unnecessary. However, we note that, while the Plaintiff presented weak causes under §§ 523(a)(4) and 523(a)(6), an alternative cause under § 727(a)(3), if it had been pleaded, would have been strong as well.

## B. PROCEDURAL AND FACTUAL HISTORY

This proceeding presents a Complaint to Determine Dischargeability of Debt and to Object to the Granting of a Discharge ("the Complaint") filed by PYRAMID TECHNOLOGY CORPORATION ("the Plaintiff") against ELLIOT COOK ("the Debtor"). The Plaintiff seeks to deny the Debtor his discharge or dischargeability of the debt to it based upon, *inter alia*, a contractual relationship between the Plaintiff and a corporation, Nicole's Inc. ("Nicole"), most recently t/a Wharton Automation Associates ("Wharton"), of which the Debtor was sole shareholder, chief executive officer, managing director, and president. According to the terms of a Value Added Reseller Agreement ("the VAR Agreement"), Wharton agreed to order computer hardware systems and software from the Plaintiff and resell those systems on the Plaintiff's behalf. This proceeding resulted when Wharton and the Debtor failed to remit the proceeds of a $349,000 sale under the VAR Agreement to the Plaintiff.

In the Complaint, the Plaintiff invoked 11 U.S.C. §§ 523(a)(4), 523(a)(6), and § 727(a)(5) in the first, second, and third Claims stated therein, respectively. Subsequently, the Plaintiff briefed a claim under § 727(a)(3) as well. These statutory provisions state as follows:

### § 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

.    .    .    .    .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ...

### § 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

.    .    .    .    .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

.    .    .    .    .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities; ...

On December 3, 1991, the Debtor filed the underlying individual voluntary Chapter 7 bankruptcy case. In his Schedule of Statements and Liabilities, the Debtor listed assets of but approximately $2,900.00.

On March 9, 1992, the Plaintiff filed the Complaint. The essential bases for the causes of action stated therein under §§ 523(a)(4) and 523(a)(6) were the Debtor's alleged defalcation of, and conversion of, respectively, the funds of $349,000 owed to the Plaintiff pursuant to a particular transaction under the VAR Agreement. The Plaintiff sought denial of the Debtor's discharge for the loss of assets including not only the $349,000, but also sums reserved by the Debtor in other transactions, the

total of which was approximately $676,-600.00.

A trial was originally scheduled on the Complaint on April 30, 1992, and continued by agreement until June 30, 1992. On April 2, 1992, the Debtor, by his counsel, Michael A. Cibik, Esquire ("Cibik"), filed a "Preliminary Objection" to the Complaint, alleging that it should be dismissed because it had been filed on March 12, 1992, beyond the March 9, 1992, bar date. Upon the Plaintiff's response and our independent review of the Complaint and its stamped filing date of March 9, 1992, we entered an Order of May 4, 1992, treating the "Preliminary Objection" as a motion to dismiss, denying same, and requiring the Defendant to answer the Complaint by May 18, 1992.

On June 30, 1992, the Plaintiff requested a further continuance of the trial. This request was contested by Michael A. Cataldo, Esquire ("Cataldo"), Cibik's associate. We granted the continuance with the proviso that a further continuance to September 17, 1992, would be the last.

On the date of trial, the Plaintiff, Cataldo, and the Debtor appeared. Cataldo and the Debtor jointly requested that the Debtor be allowed to proceed with the trial *pro se*, apparently because the Debtor was unable to afford Cibik's services. As in *Henderson, supra*, 134 B.R. at 151, we were disinclined to allow the Debtor's counsel to effectively withdraw from his representation of the Debtor in the middle of the case for financial reasons. *See also Ohntrup v. Firearms Center, Inc.*, 802 F.2d 676, 679–80 (3rd Cir.1986) (counsel not permitted to withdraw if effective administration of the judicial system is served by disallowing withdrawal); *In re Meyers*, 120 B.R. 751, 752 (Bankr.S.D.N.Y.1990) (unanticipated challenge to debtor's discharge does not justify withdrawal by debtor's counsel); and *In re Edsall*, 89 B.R. 772 (Bankr.N.D.Ind.1988) (debtor's non-payment of fees does not justify withdrawal by debtor's counsel).

Cataldo did remain. The Plaintiff presented the transcript of a deposition of the Debtor taken on July 8, 1992, and certain other documentary evidence, and rested. Despite Cataldo's presence, the Debtor became agitated at what he viewed as the Plaintiff's attempt to prevent him from presenting mounds of bank records and receipts which he had brought to the court. We allowed the Debtor an hour or two to attempt to assemble his records and discuss what could be admitted by agreement with the Plaintiff. Numerous documents were marked and the Debtor took the stand to explain his submissions. A witness present for the Debtor who was allegedly an accountant was not called. During the course of post-trial argument, the Debtor was allowed to reopen his case to append additional records. A further request to adjourn the trial to assemble and add yet more records was refused. The Debtor again became agitated. Ultimately, at the Debtor's request, we copied several hundred pages of documents, the copies of which were admitted into the record by agreement.

The Debtor testified that he is a graduate of the University of Pennsylvania ("Penn") and that he attended the Graduate School of Design at Harvard University. He stated that he was the president, managing director, and chief executive officer of Nicole. Nicole was formed in 1968, and, although he was not an original shareholder or officer, the Debtor testified that, in 1982, he bought ten percent of the corporation. The following year, he bought the remaining interest in the corporation and, thus, became Nicole's sole shareholder.

Nicole originally operated La Terrasse, a successful French restaurant near the Penn campus. The realty in which the restaurant was situated, owned by the Debtor individually, was sold to Penn for a gross price of $2 million and a net sum of $288,000 after deduction of liens against the property in January, 1990. In 1991, the Debtor also received about $27,000 from the sale of a liquor license and $12,000 for settlement of litigation connected with the realty housing the restaurant.

After La Terrasse was sold, Nicole began doing business as Wharton, in the quite distant business of computer systems

integration and the sale and installation of computer systems. It owned no property other than physical assets such as office equipment which was sold or abandoned when Wharton closed its doors in approximately April or May, 1991.

In the course of this business, Wharton and the Plaintiff became parties to the VAR Agreement. By the language of the VAR Agreement, Wharton engaged in the "sale, licensing and discounting of [p]roducts" produced by Pyramid for incorporation into computer "hardware and/or software manufactured and/or developed by" Wharton. The VAR Agreement states that Wharton agreed to pay the Plaintiff within thirty days of the date of invoices, except when delivery occurred in installments, in which case payments were required when due. If Wharton failed to pay the Plaintiff, by the terms of the VAR Agreement, the Plaintiff could either delay delivery of subsequent shipments, require pre-payment or other payment arrangements prior to subsequent shipments, or, in the event of a material breach of the VAR Agreement's terms and conditions and upon Wharton's failure to cure such breach, the Plaintiff could terminate the VAR Agreement after providing thirty days written notice which specified the circumstances of the breach.

The Debtor testified that, over its years of operation, there had existed several bank accounts under Nicole's name. When Nicole operated as Wharton, there was an operating account, a payroll account, and a business account at a "Merrill, Lynch" office called a "WCMA." However, Cook stated that the latter relatively remained inactive, since there was never any monies for deposit.

The Debtor testified that, when Wharton needed funds, he would often write checks to it from his personal account. When this occurred, he asserted that the funds would be recorded in Wharton's books as a debt owed to the shareholder. Concomitantly, when Wharton received funds, the Debtor would withdraw them and have the withdrawals noted in the corporation's books as a reduction of the debt owed to sharehold-

er. The Debtor estimated that, in the last years of its operation, Wharton owed him as much as $160,000.00. The final balance owed to the Debtor by Wharton was alleged to be approximately $60,000.00.

The transaction which obviously led to the institution of this lawsuit occurred in May, 1990, when the Debtor, per Wharton, proposed to sell a computer system of the Plaintiff ("the System") to a Philadelphia law firm, Saul, Ewing, Remick & Saul ("Saul"), and, pursuant to the VAR Agreement, issued a purchase order for this purpose.

In June, 1990, the Plaintiff issued an invoice to Wharton for the System. Later that month, Saul, the Debtor, Wharton, and the Plaintiff entered into another agreement about the System. Both agreements granted Pyramid a security interest in the System. The parties agree that the System was shipped to Saul, and that Saul paid Wharton $349,000 for the System, which was deposited into Wharton's operating account in summer, 1990.

The Debtor has not paid the Plaintiff for the System. When asked directly by the court what happened to the money paid to Wharton by Saul, the response was that "[t]he company expenses just ate it up."

The Plaintiff accurately describes the crux of this case as revolving around the Debtor's failure to address this important question in any fashion other than to produce a barrage of bank records and checks which purportedly document Wharton's alleged voracious appetite for cash. Despite this supposed loan/repayment relationship between Wharton and the Debtor, the Debtor testified that there were no documents to evidence this relationship, such as promissory notes. He also stated that the Minute Book for Wharton had been lost while the remainder of the business was moved to New York City, where the Debtor presently resides. Thus, the Debtor claimed that it would be impossible to determine whether any corporate resolutions permitting Wharton to borrow from and to repay funds to the Debtor existed. Regardless, the Debtor did not testify whether such documentation even existed. The

only documentation presented by the Debtor were account statements, checks, the Debtor's personal tax returns for the tax years 1988 through 1990, and Wharton's tax returns for 1988 and 1989. With these documents and sparse testimony, the Debtor sought to explain the loss of the approximately $676,622.00. The Plaintiff proved that within two years of the Debtor's filing Wharton or he had received (1) the $349,-000.00 from Saul for the System during the summer of 1990; (2) $26,847.56 from the sale of a liquor license in January, 1991, (3) approximately $12,000.00 from settlement of litigation in May or June, 1991; and (4) $288,774.62 from the sale of realty in January, 1990.

During the course of his testimony, the Debtor did not deny that any of these assets had actually existed. The only oral evidence presented by the Debtor was amorphous testimony which stated that the $349,000.00 was totally used by Wharton for business expenses before a dispute he had with the Plaintiff had been resolved. The Debtor stated subsequently that he did not have receipts regarding such business expenses, all that he had to "track" such expenses were the stacks of checks he produced. Otherwise, he failed to provide any testimonial evidence as to the disposition of the approximately $676,622.00 in funds.

On the date following the trial, pursuant to this court's Order, the Plaintiff was directed to file Proposed Findings of Fact and Conclusions of Law and/or Brief on or before October 7, 1992. The Debtor's deadline for filing the same documents was October 27, 1992.

The Plaintiff's Brief discussed, in the following order, non-dischargeability for defalcation under § 523(a)(4), embezzlement under § 523(a)(4), conversion under § 523(a)(6), § 727(a)(3), and § 727(a)(5).

The Debtor's submissions were signed by Cataldo, but bear the trappings of *pro se* filings. The text of the Brief attacks two "lies" allegedly promulgated by the Plaintiff: (1) it did not know that Nicole and Wharton were entities separate from the Debtor individually; and (2) its counsel refused to obtain advice from an accountant,

who could have readily clarified the alleged confusion in his records. We note that these issues are at best tangential to the crucial issue of the disposition of the proceeds of the Saul transaction and of the sales of the Debtor's property.

Attached to the Debtor's Brief are several documents not admitted into evidence nor offered at trial. These include a large number of pages of what is designated as "Detail Trial Balance/Cumulative General Ledgers" of the Debtor and Nicole from September 1, 1989, through September 17, 1992. These documents appear to be computer print-outs, and their contents are not explained anywhere in the text of the Brief except insofar as the Debtor submits them as "evidence" that all of his records have at all times been opened and available to the Plaintiff and the interim Trustee in the Debtor's bankruptcy case.

■ On November 4, 1992, the Plaintiff submitted an unsolicited Reply Brief. Such submissions, except by permission of the court after notice to the opposing party, are generally greatly disfavored. *See In re Jungkurth,* 74 B.R. 323, 325–26 (Bankr. E.D.Pa.1987), *aff'd sub nom., Jungkurth v. Eastern Financial Services, Inc.,* 87 B.R. 333 (E.D.Pa.1988).

■ The Plaintiff's conduct in submitting this Reply Brief is partially excused by noting that the initial subject discussed in that Brief is the impropriety of the Debtor's attempts to submit evidence into the record by attaching same as exhibits to post-trial submissions. Such efforts on the Debtor's part are clearly inappropriate, and this "evidence" cannot be received or considered by the court. *See In re Lease–A–Fleet, Inc.,* 131 B.R. 945, 951–52 (Bankr. E.D.Pa.1991), *aff'd in part & rev'd in part on other grounds,* 141 B.R. 63 (E.D.Pa. 1992); and *In re Mirkin,* 100 B.R. 221, 226 n. 5 (Bankr.E.D.Pa.1989). The Plaintiff could not have been aware of these improprieties of the Debtor until after it received the Debtor's Brief.

However, less excusable is the inclusion, in the Reply Brief, of rebuttals to the few authorities cited in the Debtor's Brief. Moreover, the Plaintiff alleges no effort to

attempt to approach the Debtor or his counsel or even the court to obtain agreement or permission to make this submission. Therefore, we will not consider the contents of the Plaintiff's Reply Brief any more than we will the Debtor's submissions of matters not in the record, which the Plaintiff's Brief ironically attacks as having been improperly presented to the court.

## C. CONCLUSIONS OF LAW/DISCUSSION

### 1. THE DEBTOR MUST BE DENIED A DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(5) FOR FAILURE TO SATISFACTORILY EXPLAIN THE LOSS OF APPROXIMATELY $676,622.00 IN ASSETS.

Because the subjects of the adversary proceeding at bar are several objections to the discharge of the Debtor, this court is empowered by 28 U.S.C. §§ 157(b)(1), (b)(2)(J) to both hear and decide the instant core proceeding.

■ The determination of the eligibility of the Debtor for a discharge is squarely within the sound discretion of this court. *In re Suttles*, 819 F.2d 764, 766 (7th Cir. 1987); *In re Dolin*, 799 F.2d 251, 253 (6th Cir.1986); *Stout v. Prussel*, 691 F.2d 859, 861 (9th Cir.1982); *McBee v. Sliman*, 512 F.2d 504, 506 (5th Cir.1975); and *In re Gallini*, 96 B.R. 491, 493 (Bankr.M.D.Pa. 1989). In exercising its discretion, this court is under a mandate to construe the subject objections strictly against the Plaintiff and in favor of the Debtor. *See, e.g., In re Burgess*, 955 F.2d 134, 137 (1st Cir. 1992); and *Henderson, supra*, 134 B.R. at 156. In denying a discharge, this court must provide real and substantial reasons, rather than technical and conjectural justifications, therefor. *See Burgess, supra*, 955 F.2d at 137; and *In re Tully*, 818 F.2d 106, 109 (1st Cir.1987).

The appropriate standard of proof for an action under 11 U.S.C. § 727 appears to be that the plaintiff must establish its right to relief by a "preponderance of the evidence." *See In re Serafini*, 938 F.2d 1156, 1157 (10th Cir.1991); *Henderson, supra*, 134 B.R. at 156; *In re Cook*, 126 B.R. 261,

265 (Bankr.E.D.Tex.1991); and *In re Jacobe*, 116 B.R. 463, 469 (Bankr.E.D.Va. 1990). As this court noted in *Henderson, supra*, 134 B.R. at 156, quoting *Burch v. Reading Co.*, 240 F.2d 574, 579 (3rd Cir.), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), the plaintiff's

> "burden is to convince [the factfinder] upon all the evidence before [it] that the facts asserted by the plaintiff are more probably true than false ... the [factfinder] must at least be convinced that the evidence considered as a whole, its "preponderance" to use the traditional term, indicates that the facts asserted by the plaintiff are probably true."

*Cf. Grogan v. Garner*, 498 U.S. 279, ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (the plaintiff in a dischargeability proceeding must prove a case by the "preponderance of the evidence" standard).

The case law on the issue of denial of a debtor's discharge under § 727(a)(5) is legion. However, the starting point of all precedent necessarily must be Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 4005. Pursuant to F.R.B.P. 4005, the party objecting to discharge has the initial burden of producing evidence to establish the grounds for its objection, *i.e.*, an unexplained loss of assets by the Debtor. *See, e.g., Burgess, supra*, 955 F.2d at 137; *In re Chalik*, 748 F.2d 616, 619 (11th Cir.1984); *In re Radcliffe*, 141 B.R. 1015, 1018 (Bankr.E.D.Ark.1992); *In re Wolfson*, 139 B.R. 279, 285 (Bankr.S.D.N.Y.1992); *In re Urban*, 130 B.R. 340, 344 (Bankr.M.D.Fla. 1991); and *Trinsey, supra*, 114 B.R. at 90. *Cf. Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3rd Cir.1992) (a similar initial burden of proof arises for the plaintiff in a case brought under § 727(a)(3)).

■ The courts vary somewhat on articulation of the necessary elements which the plaintiff must establish to meet this burden. Some courts hold that the party opposing the discharge must show that "the debtor had a cognizable ownership interest in a specific identifiable property at a time not too far removed from the date of the filing of his petition," which the

debtor no longer possesses. *In re Beausoleil,* 142 B.R. 31, 37 (Bankr.D.R.I.1992); and *In re Turpin,* 142 B.R. 491, 496 (Bankr.M.D.Fla.1992), citing *Chalik, supra,* 748 F.2d at 616. Other courts simply require that there be proof of a loss, or an "unexplained loss or deficiency of assets." *Wolfson, supra,* 139 B.R. at 288. *See also In re Craig,* 140 B.R. 454, 459 (Bankr. N.D.Ohio 1992); and *In re McCall,* 76 B.R. 490, 492 n. 1 (Bankr.E.D.Pa.1987). One court states that what is required is proof of a "sudden drastic loss of assets just prior to the filing of the bankruptcy." *In re Horridge,* 127 B.R. 798, 799 (S.D.Tex. 1991).

Regardless of which articulation of the plaintiff's burden is accepted, once the opponent to discharge meets its burden of proving a substantial loss of assets by the Debtor, the burden shifts to the debtor to provide a satisfactory explanation for the loss of the assets. *Chalik,* 748 F.2d at 619; *In re Zell,* 108 B.R. 615, 628 (Bankr. S.D.Ohio 1989); and *In re Hendren,* 51 B.R. 781, 788 (Bankr.E.D.Tenn.1985). *Cf. Alten, supra,* 958 F.2d at 1233–34 (similar burden of proof arises for the debtor in a § 727(a)(3) action).

The determination of whether a debtor satisfactorily explains the loss, or deficiency, of assets is a question of fact. *See Chalik, supra,* 748 F.2d at 619; *In re Harper,* 117 B.R. 306, 311 (Bankr.N.D.Ohio 1990); and *In re Gallini,* 96 B.R. 491, 493 (Bankr.M.D.Pa.1989). As a result, as with § 727(a)(3), courts have held that the "question of satisfactoriness turns on the nature of the debtor's business, financial affairs, and lifestyle." *Zell, supra,* 108 B.R. at 629; and *Gallini, supra,* 96 B.R. at 493, quoting *In re Drenckhahn,* 77 B.R. 697, 709 (Bankr.D.Minn.1987). In order to preserve the discharge, the Debtor, at a minimum, must render some explanation regarding the loss of assets which is convincing to the court. *Chalik, supra,* 748 F.2d at 619; *Beausoleil, supra,* 142 B.R. at 37; *Horridge, supra,* 127 B.R. at 799; *Trogdon, supra,* 111 B.R. 655, 659 (Bankr. N.D.Ohio 1990); and *Zell, supra,* 108 B.R. at 629. The bankruptcy court,

"after having heard the excuse, the explanation, [must have] that mental attitude which finds contentment in saying that [it] believes the explanation—[it] believes what the [debtor] say[s] with reference to the disappearance or shortage. [It] is satisfied. [It] no longer wonders. [It] is contented."

*In re Wheeler,* 38 B.R. 842, 846 (Bankr. E.D.Tenn.1984), quoting *In re Shapiro & Ornish,* 37 F.2d 403, 406 (N.D.Tex.1929), aff'd, 37 F.2d 407 (5th Cir.1930). *See also First Texas Savings Ass'n, Inc. v. Reed,* 700 F.2d 986, 993 (5th Cir.1983); *Craig, supra,* 140 B.R. at 459; *Trogdon, supra,* 111 B.R. at 659; and *Hendren, supra,* 51 B.R. at 789.

Explanations of losses provided by debtors which are generalized, vague, and uncorroborated by documentation are unsatisfactory. *See Dolin, supra,* 799 F.2d at 253; *Chalik, supra,* 748 F.2d 616 at 619; *Reed, supra,* 700 F.2d at 993: *Baum v. Earl Millikin, Inc.,* 359 F.2d 811 (7th Cir. 1966); *Wolfson, supra,* 139 B.R. at 288; *Trogdon, supra,* 111 B.R. at 659; and *Gallini, supra,* 96 B.R. at 493. The debtor should be prepared to provide, with some specificity, evidence regarding the loss, or deficiency, of assets such as records, receipts, and cancelled checks. *See Radcliffe, supra,* 141 B.R. at 1023; and *Harper, supra,* 117 B.R. at 311. In line with evidence rendered by a debtor in substantiation of his explanation of loss, the manner in which the debtor's records are presented is in issue. As in a § 727(a)(3) analysis, the court is required to peruse the recorded information provided by the debtor to determine the adequacy of the proffered explanation. Therefore, the orderliness of the debtor's corroborating recorded information is in issue. *See Goldstein,* 123 B.R. at 525.

It is true that, in the absence of recorded information, such as records, receipts, and canceled checks, the court may grant discharge based upon credible explanatory testimony. *Craig, supra,* 140 B.R. at 459, quoting *Zell, supra,* 108 B.R. at 629; *Gallini, supra,* 96 B.R. at 493; *Drenckhahn, supra,* 77 B.R. at 709; and *Hendren, su-*

*pra,* 51 B.R. at 789. However, as is noted at *id.,*

> [a] determination of credibility involves not simply an assessment of whether the court is dealing with willful, flagrant falsehood, but also an assessment of whether the court has been provided acceptably accurate information bearing some reasonable relationship to actual fact. In short, the court must have ... some sense that it is dealing with more than an unreliable remake of reality, custom-made to comport with current exigencies.

■ Based upon the facts in this record, the Plaintiff has carried the initial burden of persuasion. The Debtor admits the receipt and loss of a substantial sum of money in a brief period of time, *i.e.,* receipt of more than $676,600 in a period of less than two years before the Debtor's bankruptcy filing, all of which has been dissipated.

We believe that, in response thereto, the Debtor has failed to explain satisfactorily the loss of these sums. Even if we considered all of the copious records presented by the Debtor, including even those improperly appended to his Brief, these records do little in the way of explaining, with any degree of clarity, the specific disposition of the subject funds. Pouring through the evidence was not an easy task, especially in light of the paucity of testimonial evidence to explain the multitude of checks and records.

As was noted in *Goldstein, supra,* 123 B.R. at 523–24, the level of business sophistication of the Debtor is an important guidepost in determining the satisfactoriness of a debtor's explanation for the absence of records. The Debtor indicated that he was clearly more sophisticated than the *Goldstein* debtor. He is a graduate of Penn, who was well on his way to achieving an advanced degree at Harvard. He owned and managed property which he later sold to Penn for approximately $2 million dollars. He engaged in complicated business transactions, as evidenced by the VAR Agreement. *Compare Alten, supra,* 958 F.2d at 1231–32.

We find that the Debtor studiously avoided a direct response to the most basic inquiry, *i.e.,* where did the money received by him go? The Debtor's responses to this inquiry were never direct. They included an attempt to change the subject by raising other issues, *e.g.,* his alleged disputes with the Plaintiff; a counter-attack upon the Plaintiff because its counsel is not an accountant and no accountant was hired by it to analyze his records; and an attempt to convince us that the answer to this question was, like a hidden treasure, buried within an ever-increasing volume of largely inscrutable records the relevance of which the Debtor was never really able to explain.

The burden was upon the Debtor to prove what he alone claimed was obvious from his records, *i.e.,* that he had a satisfactory explanation for his loss of substantial assets. *Compare, Trinsey, supra,* 114 B.R. at 91 (failure of head of large family [the debtor apparently has no dependents] to justify expenditure of $71,000 to support his family over about one year resulted in denial of discharge).

At certain points, the Debtor admitted the inadequacies of his record-keeping, but attempted to foist the blame, like the proverbial lawyer (or judge) with the allegedly error-prone secretary, to a "slow" and inadequate bookkeeper. It cannot be gainsaid that, if the Debtor's bookkeeper was the "guilty" party, it is her employer-principal who hired her and must bear the consequences, not an innocent third-party creditor.

We note that it was the Debtor who had the burden to produce an accountant (or other evidence) to explain the disposition of assets not apparent from the Debtor's record-keeping. The Plaintiff was not required to produce an accountant to show that such factually unenlightening records were inadequate. We note that calling an accountant as witness for the debtor is precisely what the debtor did in *In re Martin,* 141 B.R. 986, 996, 997 (Bankr.N.D.Ill. 1992), one of the authorities relied upon by the Debtor. The testimony of the *Martin* debtor's accountant which was supportive

of the debtor's claim that no assets were dissipated is an important distinction between the facts of that case and those of the instant case, although we note that the *Martin* court, even with such evidence in hand, did not exonerate the debtor. *Id.* at 999–1000.[1]

The Debtor's attempt to blitz the court with raw financial data was reminiscent of the efforts of the debtor in *In re Hughes,* 873 F.2d 262, 264 (11th Cir.1989), to "simply place tow sacks of records before the bankruptcy judge and request the judge to sift through the documents and attempt to reconstruct the flow of the debtor's assets." As the result in *Hughes;* and *Goldstein, supra,* 123 B.R. at 525, establishes, such a presentation of evidence cannot suffice to satisfy the Debtor's burden to "satisfactorily explain" his loss of substantial assets.

Finally, although we hesitate to comment on the contents of the Exhibits to the Debtor's Brief because they are not properly part of the record and their meaning is, to a large degree, unclear and add little to the analysis, we find that they raise at least as many questions as they answer. We could locate no entries reflecting the receipt of the $288,000 from the sale of the Debtor's realty or the $27,000 from the sale of the liquor license. After a considerable search, we found some reference to the Saul payments on records mixed in with Exhibit "C" to the Brief (as opposed to Exhibit "B," which the Brief claimed includes this information). The account to which the said payments were credited includes numerous large and unexplained withdrawals and ends with a balance of $31,266.14, the disposition of which is also unexplained.

We recognize that the Plaintiff has not proven fraud, knowing wrongful conduct, or any other indicia of a motivation to harm the Plaintiff. *See* pages 944–945 *infra.* However, "§§ 727(a)(3) and (a)(5) ... include no ... 'subjective' elements," such as the "proof of an intention to hinder, delay, or defraud creditors, and/or knowing and

fraudulent behavior under §§ 727(a)(2) and (a)(4)" which render the latter grounds for denial of discharge "much, much more difficult to prove" than the elements of § 727(a)(5). *Cohen, supra,* 142 B.R. at 728. *See also Trinsey,* 114 B.R. at 90; and *In re Somerville,* 73 B.R. 826, 834 (Bankr. E.D.Pa.1987).

We therefore have little hesitancy in concluding that the Debtor has not produced the requisite satisfactory explanation of his loss of considerable liquid assets over a short period of time, and that therefore he must be denied a discharge in his bankruptcy case on the basis of § 727(a)(5).

2. ALTHOUGH WE NEED NOT, AND THEREFORE WILL NOT, CONSIDER THE PLAINTIFF'S ALTERNATIVE STATUTORY GROUNDS FOR RELIEF SET FORTH IN THE COMPLAINT AT LENGTH, IT APPEARS THAT THE PLAINTIFF COULD SUCCEED IN PREVENTING THE DEBTOR'S DISCHARGE UNDER § 727(a)(3), BUT COULD NOT SUCCEED IN CHALLENGING THE MERE DISCHARGEABILITY OF ITS DEBT UNDER §§ 523(a)(4) AND (a)(6).

The Debtor's failure to explain his loss of assets was due to his inability to convince us that his personal and business records adequately explained the loss. It therefore follows that, as required by 11 U.S.C. § 727(a)(3), the Plaintiff has made the requisite initial showing that the Debtor's records are inadequate and that the Debtor has failed in meeting his resulting burden to prove a justification for the record's inadequacy. *See Alten, supra,* 958 F.2d at 1232–34; and *Goldstein, supra,* 123 B.R. at 521–23. As our decision in *Trinsey, supra,* exemplifies, there is considerable overlap in § 727(a)(5) and § 727(a)(3), and the denial of a discharge on the basis of one of these Code sections often leads to the result that discharge should be denied on the basis of the other Code section as well.

---

1. Other authorities relied upon by the Debtor included *Chalik, supra;* and *In re Bailey,* 145 B.R. 919 (Bankr.N.D.Ill.1992). We note that a discharge was denied to the *Chalik* debtor and that the *Bailey* court denied the debtor's motion for summary judgment in his favor.

The only impediment to a § 727(a)(3) claim here is that the Plaintiff has not pleaded any claim under this Code section in its Complaint. Because of our finding that the Debtor's discharge must be denied under § 727(a)(5), an amendment to add a claim under § 727(a)(3), which, while perhaps appropriate, was in fact never made, is unnecessary and therefore need not be considered. *See In re Bergman,* 103 B.R. 660, 671–72 (Bankr.E.D.Pa.1989).

However, when we consider the Plaintiff's asserted grounds for denial of dischargeability, §§ 523(a)(4) and 523(a)(6), we must observe that a different result would be likely. In order to succeed in an action under § 523(a)(4), the Plaintiff was obliged to prove that the Debtor either (1) committed fraud or defalcation while functioning in a fiduciary capacity; or (2) was chargeable with embezzlement or larceny, whether or not he was acting in a fiduciary capacity. *See In re Spector,* 133 B.R. 733, 739, 741 (Bankr.E.D.Pa.1991).

A prerequisite for applicability of the first (defalcation) prong of § 523(a)(4) is a relationship whereby the debtor functions in a fiduciary capacity to the plaintiff. *Id.* at 739–40. The Plaintiff argues that VAR Agreement between the Plaintiff and the Debtor gave rise to a fiduciary relationship between the parties. However, our review of the terms of the VAR Agreement yields the conclusion that the VAR Agreement does not appear, contrary to the Plaintiff's argument that it "entrusted" the System to the Debtor, to create the requisite express trust relationship between the parties. Perusal of the VAR Agreement indicates that, if anything, the only type of relationship created thereby between the parties was a strictly contractual one, with no implications of a trust, or fiduciary, relationship.

For the purposes of satisfying the alternative (embezzlement) prong of 523(a)(4), which does not require existence of a fiduciary relationship, the Plaintiff must prove that the Debtor committed larceny or embezzlement. As noted in *Spector, supra,* 133 B.R. at 741, embezzlement amounts to the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful or with [the] consent of the owner, while in larceny, the felonious intent must have existed at the time of the taking.

■ The flaw in the Plaintiff's reliance upon this aspect of § 523(a)(4) is the absence of proof of the Debtor's fraudulent intent to deprive the Plaintiff of property. The Debtor's failure or inability to repay the Plaintiff from his or Wharton's funds, despite his having a legal obligation to do so, does not *per se* manifest fraud on the part of the Debtor. Nor is there any proof of any felonious intent by the Debtor in his removal of the subject funds.

The "embezzlement" prong of § 523(a)(4) is, to a large degree, the mirror image of a § 523(a)(6) claim that a misappropriation of funds constitutes willful and malicious conversion. *See Spector, supra,* 133 B.R. at 742; and *Bergman, supra,* 103 B.R. at 671. The Plaintiff appears to argue that the Debtor's transfer of the System to Saul without recognition of its special interest in the proceeds from Saul constitutes a conversion of the System by him within the scope of § 523(a)(6).

■ However, this court is inclined towards that interpretation of § 523(a)(6) which requires proof that the debtor intended to cause the specific injury in issue to the plaintiff to support a claim under that Code section. *See In re Long,* 774 F.2d 875, 881 (8th Cir.1985); *United States v. Stelweck,* 108 B.R. 488, 496 (E.D.Pa. 1989), *aff'g, In re Stelweck,* 86 B.R. 833, 851 (Bankr.E.D.Pa.1988); *In re McLaughlin,* 109 B.R. 14, 17 (Bankr.D.N.H.1989); and *In re Lane,* 76 B.R. 1016, 1023 (Bankr. E.D.Pa.1987). Even cases which have not adopted this restrictive interpretation of § 523(a)(6) have held that transfers of secured property "out of trust" do not necessarily render the obligations to the secured parties non-dischargeable. *See In re Littleton,* 942 F.2d 551, 554 (9th Cir.1991); *In re Posta,* 866 F.2d 364, 367–78 (10th Cir.

1989); and *In re Horldt*, 86 B.R. 823, 827–28 (Bankr.E.D.Pa.1988). Again, we observe that there is no evidence of fraud on the part of the Debtor.

These observations concerning the causes of action stated in the Complaint as alternatives to the Plaintiff's successful, principal claim under § 727(a)(5) re-emphasize the note on which we began: challenges to discharge under §§ 727(a)(3) or 727(a)(5) tend to be more easily sustained than not only challenges to discharge under § 727(a)(2) and 727(a)(4), but also most challenges to dischargeability. Therefore, our failure to sustain the Plaintiff's § 523(a) claims does not carry the day for the Debtor, nor does it counter the Plaintiff's proof of grounds for the denial of the Debtor's discharge under § 727(a)(2).[2]

## D. CONCLUSION

We will enter an Order denying the Debtor's discharge under 11 U.S.C. § 727(a)(5).[3]

---

**2.** We also note that the Plaintiff demanded recovery of its attorneys' fees and costs expended in pursuing this action against the Debtor pursuant to a clause in the VAR Agreement permitting such a claim to any party prevailing in a "dispute pertaining to matters covered by this Agreement." Since our decision in favor of the Plaintiff is not based on a breach of the VAR Agreement, but rather the Debtor's failure to explain the loss of assets acquired in several transactions, some of which did not even involve the VAR Agreement, we find that no recovery of attorneys' fees and costs is warranted. We also concluded that the Plaintiff was unlikely to have prevailed in its § 523(a) claims which were related directly to the VAR Agreement. *Cf. In re King*, 135 B.R. 734 (Bankr.W.D.N.Y. 1992) (attorneys' fees not recoverable in successful § 523(a)(2) action). *But cf. Transouth Financial Corp. v. Johnson*, 931 F.2d 1505, 1507–08 (11th Cir.1991) (creditor may recover attorneys' fees in a successful § 523(a)(2) action).

**3.** This Order will be confined to declaratory relief regarding the Debtor's eligibility for a discharge, since we believe that it should not be a function of a bankruptcy court to liquidate the debtor's liability on nondischargeable obligations. *See Stelweck, supra*, 86 B.R. at 844–45.