**In re Peter URBAN and Brenda S. Urban, Debtors.**

**Andrew MESSING, Plaintiff,**

**v.**

**Peter URBAN and Brenda S. Urban, Defendants.**

**Bankruptcy No. 90–2435–8P7. Adv. No. 90–418.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

July 10, 1991.

Randolph A. Fabal, Tampa, Fla., for plaintiff.

Harvey P. Muslin, Tampa, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OF OPINION

ALEXANDER L. PASKAY, Chief Judge.

This is a Chapter 7 case and the matter under consideration is the Second Amended Complaint filed by Andrew Messing (Plaintiff), the Plaintiff in the above captioned adversary proceeding. Count I of the Amended Complaint is based on 11 U.S.C. § 727(a)(4)(A) and alleges that the Debtors knowingly and fraudulently made false oaths in connection with this case. Count II is based on § 727(a)(3) and alleges that the Debtors failed to keep and preserve books and records from which their financial condition could be ascertained. Count III is based on § 727(a)(5) and alleges that the Debtors have failed to satisfactorily explain the loss of certain of their assets to meet their liabilities. Based on the foregoing, the Plaintiff contends that the Debtors' discharge should be denied. The facts which are relevant to the resolution of this matter, as established at the final evidentiary hearing, may be summarized as follows:

The Debtors filed their voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code on March 19, 1990. Dr. Peter Urban is an ophthalmologist who commenced his practice in Bartow, Florida in July of 1984. During the latter part of 1984 and the early part of 1985, Dr. Urban built an office in South Lakeland and thereafter set up numerous corporations for his ophthalmology practice. These corporations included Peter Urban, M.D., P.A., Florida Eye Care, Inc. and Florida Eye Care, Inc. of Lakeland. Around this time Dr. Urban conceived the idea of setting up ambulatory surgery centers to provide surgical eye care in as many cities in Florida as possible. In an attempt to effectuate this plan, Dr. Urban entered into an agreement with the Plaintiff, as a result of which the parties formed a corporation known as First Choice Medical Services, of which Dr. Urban was the President. First Choice Medical Services never established any ambulatory surgery centers and apparently never operated any business.

However, in 1986, Dr. Urban and Mr. John Walden entered into a partnership and formed two corporations, Florida Eye Care, Inc. of Melbourne and H.C.R., Inc. of Brevard, to operate a surgical center in Melbourne, Florida, and two corporations known as Florida Eye Care, Inc. of Lakeland and H.C.R., Inc. of Lakeland to operate a surgical center in Lakeland, Florida. It is undisputed that when the Lakeland and Melbourne corporations were formed, Dr. Urban and his wife, Brenda, owned 50% of the stock in all the corporations and Christiann Walden, John Walden's wife, owned the other 50% of the stock. These corporations are currently operating surgical centers. With both the Melbourne and Lakeland surgical centers, Florida Eye Care, Inc. of Melbourne and Florida Eye Care, Inc. of Lakeland operated the centers, while H.C.R., Inc., of Brevard and H.C.R., Inc., of Lakeland owned the business assets.

In addition, Dr. Urban formed corporations known as H.C.R. Inc. of Ocala, H.C.R., Inc. of Daytona and Florida Eye Care, Inc. of Daytona, none of which ever transacted business. It is undisputed that within six years prior to the filing of the Petition initiating this case, Dr. Urban was a director, president and vice-president of a business called East Coast Eye Associates, Inc. Dr. Urban resigned from this office as president on November 1, 1987 (Debtors' Exh. 1). Further, Dr. Urban was involved in a business known as Family Vision Centers South, Inc., of which he was both a director and a vice president.

At present, Dr. Urban is employed by Florida Eye Care, Inc. of Lakeland, as its only medical doctor and chief medical director and earns $100,000 annually (Exh. 62). In addition, Dr. Urban is entitled to receive 80% of profits generated by him at Florida Eye care, Inc., of Lakeland (Exh. 62). Further, Florida Eye Care, Inc., of Lakeland leases two cars for Dr. Urban, has paid accountants' and lawyers' fees for Dr. Urban, and has made payments on Dr.

Urban's back taxes. Dr. Urban claims to have repaid Florida Eye Care, Inc., for the personal expenses it has paid on his behalf; however, Dr. Urban has no documentation to support this contention.

In addition to the foregoing medical corporations, it is undisputed that within six years of the Debtors' filing their Voluntary Petition, Dr. Urban was involved in numerous real estate businesses. The first of these was commenced in 1985, when Dr. Urban agreed to purchase a parcel of real property from LESJAY Corporation for approximately one million dollars. In purchasing this property, Dr. Urban intended to subdivide the property and sell parcels to allow him to recoup his initial investment and then to finance the construction of a residence on one of the parcels. Dr. Urban was unable to comply with the terms of the contract for sale, and ultimately LESJAY obtained a judgment in the amount of $230,000.00 against Dr. Urban (Exh. 59). Dr. Urban also entered into an agreement with Keith Hilliard whereby they formed a corporation known as New Florida Development Company to purchase and develop a parcel of real property located in Lakeland.

It appears that in the fall of 1988, Dr. Urban transferred his shares of stock in Florida Eye Care, Inc. of Melbourne and H.C.R. Inc. of Brevard back to those corporations for the sum of $106,000.00. According to Dr. Urban, he did not deposit the $106,000.00 in a bank account, but kept these funds in cash. The only record regarding the disposition of these funds is a written narrative prepared by Dr. Urban after the filing of this case which was prepared at the request of the Trustee. (Exh. 5A). The written statement provided that Dr. Urban spent $50,000.00 for payment of a promissory note, $13,000.00 on the adoption of a child, $47,000.00 on past due taxes and $7,000.00 on accounting services. However, it appears that John Walden actually made the $50,000.00 payment on the promissory note, Florida Eye Care, Inc., of Lakeland paid the $47,000.00 in past-due taxes, that the Debtor borrowed money to pay his accountants and that $5,000.00 of the $13,000.00 spent on the

adoption came from Brenda Urban's bank account.

The disposition of the $106,000.00 is further confused by the fact that Dr. Urban in fact received the $106,000.00 by way of a cashier's check made payable to Dr. Urban with John Walden as the remitter. (Exh. 68 and 72). This cashier's check was endorsed by Dr. Urban, and under the endorsement the check states "$105,92.68, paid to Lawyer's Title Insurance Corp." It appears that Dr. Urban then purchased a cashier's check in the amount of $105,920.68 made payable to Lawyer's Title Insurance Corporation. (Exh. 72).

In November of 1986 the Debtors transferred their stock interests in H.C.R. of Lakeland back to the corporation in exchange for the corporation's assumption of certain debts owed individually by the Debtors. On December 15, 1988 the Debtors transferred their stock interests in Florida Eye Care, Inc. of Lakeland back to that corporation, again in exchange for the satisfaction of certain debts owed by them to John Walden. The record does not reveal the amount of debt assumed by H.C.R., Inc. of Lakeland, nor does it reveal the amount of debt satisfied by the Debtors' transfer of their stock to Florida Eye Care, Inc. of Lakeland.

The record further reveals that in 1986 Dr. Urban received a loan in the amount of $200,000 from Johnson & Johnson Finance Company. The Debtor has no records to trace the ultimate disposition of these funds.

It is undisputed that the Debtors failed to disclose their involvement with all of the medical businesses listed above, except Florida Eye Care, Inc. of Lakeland, on their Statement of Financial Affairs filed at the commencement of this case. Neither did they disclose Dr. Urban's involvement in the real estate venture or New Florida Development Company described above. Likewise, the Debtors failed to disclose that they owned stock in Florida Eye Care, Inc., on their B–2 Schedule of Personal Property filed in this case.

In addition to failing to disclose their involvement with and stock interests in the businesses described above as required by Question 2(c) of the Statement of Financial Affairs and the B–2 Schedule of Personal Property, the Debtors failed to disclose several bank accounts maintained by them. First, the Debtors failed to disclose a joint account maintained by them at First Florida Savings Bank (First Florida) (Exh. 78). Next, the record reveals that Brenda Urban failed to disclose the existence of the following bank accounts: a savings account at First Florida in the name of Brenda Urban or John Walden (Exh. 73); a money market account at First Florida in the name of Brenda Urban or John Walden (Exh. 74); a checking account at Sun Bank in the name of Brenda Urban (Exh. 75); a checking account at NCNB National Bank in the name of Brenda Urban or John Walden (Exh. 76); and a checking account at First Florida in the names of Brenda Urban or John Walden (Exh. 77). Apparently, Brenda Urban either forgot about these accounts when she signed the Statement of Financial Affairs and Schedules, thought the balances maintained were too nominal to warrant listing, or believed she was not required to disclose any bank accounts not maintained jointly with Dr. Urban.

It is also undisputed that the Debtors owned two parcels of real property in Lakeland known as Scott's Lakeland Heights Property at the time they filed their voluntary Petition. Again, the Debtor failed to disclose their ownership of these properties in their B–1 Schedule of Real Property.

■ Based on the foregoing facts, as established at the final evidentiary hearing, the Plaintiff alleges that the Debtors' discharge must be denied based on 11 U.S.C. § 727(a)(3), (a)(4)(A), and (a)(5). These sections provide as follows:

§ 727.  **Discharge**
(a) The Court shall grant the debtor a discharge, unless—

.  .  .  .  .

(3) the debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information including books, documents, records and papers from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently in or in connection with the case—

(A) made a false oath or account . . .

At the outset it should be noted that under § 727, the objecting party has the burden of proving that a debtor should be denied his discharge.  B.R. 4005;  *In re Bernstein*, 78 B.R. 619 (S.D.Fla.1987).  As noted by the Supreme Court in dicta in the case of *Grogan v. Garner*, 498 U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), this burden is a mere preponderance of the evidence, at least for complaints based on § 727(a)(4).

■ There is no question that the Statement of Financial Affairs and Schedules of Assets and Liabilities serve the important purpose of insuring that adequate information is available for the Trustee and creditors without need for investigation to determine whether the information provided is true.  *In re Muscatell*, 113 B.R. 72 (Bankr.M.D.Fla.1990).  Even if undisclosed assets are worthless or unavailable to creditors, a debtor has an obligation to make full disclosure.  *In re Chalik*, 748 F.2d 616 (11th Cir.1984).  The subject matter of a false oath is "material" if it bears a relationship to the debtor's business transactions or assets.  *Id.*, at 618; *In re Steiker*, 380 F.2d 765 (3d Cir.1967).  There is no question that deliberate omissions warrant a denial of the debtor's discharge.  Likewise, when a debtor makes numerous omissions from his Statement of Affairs and Schedules, the omissions together may constitute a pattern demonstrating a reckless disregard for the truth.  *In re Clawson*, 119 B.R. 851 (Bankr. M.D.Fla.1990).

Applying these principles to the facts developed in this case, this Court is satisfied that the Plaintiff has easily met his burden of proof proving that the Debtors'

discharge should be denied under § 727(a)(4)(A). There is absolutely no question that Dr. Urban failed to disclose his affiliation and stock interests in numerous medical corporations and real estate ventures. Further, both Debtors failed to disclose several bank accounts and their ownership of two parcels of real property. In sum, the magnitude of omissions from their Schedules and Statement of Financial Affairs evidences at least a gross disregard for the truth, if not a deliberate failure to disclose these items.

This Court is also satisfied that the Plaintiff has met his burden of proof under § 727(a)(3) and (a)(5) with respect to Dr. Urban. When a debtor's right to discharge is challenged under § 727(a)(3) and (a)(5), the initial burden to establish that the debtor's discharge should be denied is on the objecting creditor. However, the burden shifts to the debtor who must, under § 727(a)(3), establish either that the debtor maintained adequate books and records from which his financial condition could be ascertained or that the failure to keep adequate books and records was justified under the circumstances. *In re Goblick*, 93 B.R. 771 (Bankr.M.D.Fla.1988); *In re Esposito*, 44 B.R. 817 (Bankr.SDNY 1984). Under § 727(a)(5), once the objecting creditor has established that the debtor had a cognizable ownership interest in a specific identifiable property at a time not too far removed in time from the date of filing his petition, the burden shifts to the debtor to satisfactorily explain the loss of that particular asset, if at the time the petition is filed, the debtor claims he no longer has the particular property. *In re Chalik supra*, 748 F.2d at 616. To be satisfactory, the explanation must be strong enough to convince the trier of fact. *In re Goblick, supra*, 93 B.R. at 775.

This record leaves no doubt that Dr. Urban is a highly educated man who was involved in a multitude of complex business transactions. While it is true that the duty to keep books and records is not absolute and depends on the circumstances, it is equally true that one with business dealings as extensive as Dr. Urban's should have extensive records from which his financial condition could be ascertained. Dr. Urban was unable to show that he maintained *any* books or records regarding his financial dealings. Therefore, under these circumstances, this Court is satisfied that Dr. Urban's discharge must be denied under § 727(a)(3). However, as to Brenda Urban, this Court is satisfied that the plaintiff has failed to meet his burden of proof under § 727(a)(3). Mrs. Urban is employed part-time as a nurse, and the record does not reveal that the records from the checking accounts maintained by her were not sufficient to explain her financial condition.

Similarly, while the Plaintiff has met his burden of proof as to Dr. Urban under the Count of the Complaint based on § 727(a)(5), the Plaintiff has failed to establish that Brenda Urban ever owned any assets that she no longer owned as of the date of the filing of the Petition. However, the record is entirely different as to Dr. Urban. There is no question that the conflicting explanation offered by Dr. Urban in no way convinced this Court of the disposition of the $106,000.00 or the proceeds of the $200,000.00 loan from Johnson & Johnson.

In sum, this Court is totally satisfied that although the record does not warrant denying Brenda Urban's discharge under § 727(a)(3) or (a)(5), it does entirely warrant denying the discharge of both Dr. Urban and Brenda Urban under § 727(a)(4)(A), and denying Dr. Urban's discharge under § 727(a)(3) and (a)(5).

A separate Final Judgment shall be entered in accordance with the foregoing.