In re Linda H. ROSS, Debtor.

**WILLIAMSON CONSTRUCTION, INC., Plaintiff,**

v.

**Linda H. ROSS, Defendant.**

**Bankruptcy No. 96–4695–3P7. Adversary No. 96–577.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Jan. 20, 1998.

Nicholas V. Pulignano, Jr., Marks, Gray, Conroy & Gibbs, Jacksonville, FL, for Plaintiff.

Clive N. Morgan, Clive N. Morgan, P.A., Jacksonville, FL, for Defendant.

Valerie Hall Manuel, Hall & Hall, P.A., Jacksonville, FL, Chapter 7 Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This proceeding came before the Court upon a complaint objecting to discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3) and (a)(4), and seeking an exception to discharge pursuant to 11 U.S.C. § 523(a)(2)(A). Trial was held on July 8, 1997, August 6, 1997, and September 8, 1997. Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. The parties' dispute dates from October 1988, when Plaintiff filed suit in Cobb County, Georgia Superior Court, against Defendant's husband, James S. Ross (Ross), seeking damages in excess of $400,000 for breach of a construction contract (Contract Action).

2. The Contract Action arose from Ross' involvement in a residential development venture in Marietta, Georgia called "Lost Mountain Township." In 1985, Ross formed Sayre–Ross, Inc. (Sayre–Ross), with Kermit Sayre, for the purpose of developing the Lost Mountain Township. The development was constructed in two phases: Phase I consisted of 35 lots and Phase II consisted of 42 lots. (Tr. at 26). Plaintiff performed the grading and laid out the streets, sewer lines, and water lines for Phase II of Lost Mountain Township. (Plaintiff's Ex. 13, at 17). Plaintiff also did work for Summit–Top Development, Inc. (Summit–Top), another corporation involved in the development of Lost Mountain Township and owned by Ross and Kermit Sayre. (*Id.* at 5).

3. On January 31, 1991, Plaintiff obtained a final judgment in the Contract Action against Ross, Kermit Sayre, and Summit–Top, in the amount of $436,727.74. (Tr. at 47). A Writ of Fieri Facias was issued, and Plaintiff was able to place a lien on property owned by Summit–Top. In order to bond the lien, Summit–Top needed to post unencumbered collateral. At that time, Defendant owned a residential lot, worth approximately $100,000, that was free of any encumberances. Defendant agreed to post the residential lot to bond Plaintiff's lien. (*Id.* at 164). On June 7, 1994, Plaintiff sold the residential lot at a Sheriff's sale for $74,000. (Defendant's Ex. 3).

4. In August 1991, Sayre–Ross filed for Chapter 11 protection in the United States Bankruptcy Court for the Northern District of Georgia. (Plaintiff's Ex. 14–3). At that time, Sayre–Ross owned 13 residential lots in the Lost Mountain Township project with assets totaling $1,208,000. Sayre–Ross had secured debts in the amount of $469,460 to Resolution Trust Corporation and $135,000 to

Rachel Caviness (Caviness), a Georgia resident. (*Id.*). Sayre–Ross' debt also included an unsecured debt owed to Defendant for $121,717, for various loans Defendant provided to the corporation from January 20, 1987 to July 1, 1990. (Plaintiff's Ex. 14).

5. On August 5, 1994, Sayre–Ross filed its Final Report and Application for Final Decree, showing that the Resolution Trust Corporation had been paid in full, and Caviness had been paid $72,766.73 under the Chapter 11 plan with further arrangements to "pay her claim after the plan [had] been concluded." (Plaintiff's Ex. 14–7, at 2). Caviness' claim is now valued at $25,422. (Tr. at 70).

6. Sayre–Ross came out of bankruptcy owning lots 36, 59, 62, and 68 in Lost Mountain Township. (Tr. at 28). On February 29, 1996, lot 62 was sold for $47,500, and lot 59 was sold on July 22, 1996 for $52,500. (Plaintiff's Ex. 14–8; Plaintiff's Ex. 14–9). Total net proceeds from those sales was $78,949. (Plaintiff's Ex. 16–4).

7. In August 1989, while the Contract Action litigation was pending, Ross transferred his interest in two parcels of real property to Defendant. One parcel was a residential lot in North Cook Farms subdivision of Cobb County, Georgia, and the other was Ross' half-interest in the marital residence, located on Cinnamon Teal Court in Marietta, Georgia (Marietta Property). (Defendant's Ex. 15). The deeds were recorded on August 28, 1990 and September 10, 1990, respectively. (*Id.*).

8. On March 11, 1994, Plaintiff filed a Complaint for Fraudulent Conveyance against Defendant and Ross in the Superior Court of Cobb County, Georgia, Civil Action No. 94–11661–24 (Georgia Action). (Complaint Ex. A). Plaintiff claimed that Ross transferred his interests in the two properties to prevent its collection on the Contract Action judgment. (*Id.*).

9. Ross filed for personal bankruptcy in the Southern District of Florida on September 28, 1994, listing Plaintiff as a creditor. (Plaintiff's Ex. 19). Plaintiff failed to file a timely proof of claim. (*Id.*). Ross obtained a discharge on January 27, 1995. (*Id.*).

10. On August 5, 1996, approximately one month before the fraudulent conveyance action was scheduled for trial, Defendant voluntarily filed a petition for relief under Chapter 7 of the Bankruptcy Code. 11 U.S.C. § 101–1330 (1997). Defendant admits that, upon the advice of counsel, she filed the petition to halt the Georgia Action. (Tr. 97–98). Ross assisted Defendant with her bankruptcy petition. (*Id.* at 6).

11. Defendant listed Plaintiff as an unsecured creditor on her bankruptcy schedules, and Plaintiff filed a Proof of Claim on December 17, 1996, asserting that Defendant is indebted to it for $250,000 pursuant to the Georgia Action. (Claims File 2). Plaintiff listed its claim as unsecured and not subject to set-offs or counterclaims. (*Id.*).

12. On Defendant's Schedule A, "Real Property," she listed a joint interest in the Marietta Property and a sole interest in property located in Port St. Lucie, Florida and in Big Canoe, Georgia. Defendant listed the total current market value of all three properties as $180,000. (Plaintiff's Ex. 2). On her Schedule B, "Personal Property," Defendant lists, *inter alia;* an interest in Sayre–Ross, valued at $10; a 1983 Cadillac, valued at $1,000; and a 1977 Oldsmobile, valued at $200. (*Id.*). Defendant later amended Schedule B to include a 1987 Lincoln Continental valued at $4200. (Doc. 31).

13. Defendant was employed part-time by Ross' engineering firm in Atlanta, J.S. Ross & Associates, from 1975 to May 1990. (Tr. at 4). She helped with quarterly tax reports, accounts payables and receivables, blueprinting, and secretarial duties. (*Id.* at 92). Defendant currently serves as Secretary of Sayre–Ross. (Plaintiff's Ex. 22, at 20). In 1996, the year Defendant filed her petition, she earned 16,522.00 from Sayre–Ross. (Plaintiff's Ex. 2, 14–4).

14. Since June 1, 1996, Defendant has served as Secretary of Lind–Aire Corporation (Lind–Aire). (Plaintiff's Ex. 21, at 47–50; Tr. at 132). Prior to that date, Defendant served as President. (*Id.*). Lind–Aire owns two aircraft: a Cessna 172 and a Piper Twin Comanche. (Plaintiff's Ex. 21, at 52). In 1990, J.S. Ross & Associates sold the

Cessna 172 to Defendant's father, George Herron. (*Id.* at 57). In 1993, Defendant inherited the Cessna 172 upon her father's death. (*Id.* at 53). On May 25, 1995, Defendant sold the Cessna 172 to Lind–Aire for $15,000. (*Id.;* Plaintiff's Ex. 14).

15. On December 12, 1996, Plaintiff filed a Complaint to Determine Dischargeability of Debt pursuant to 11 U.S.C. § 523 and an Objection to Discharge pursuant to 11 U.S.C. § 727. The Complaint alleges three separate grounds for denial of discharge: (1) that Defendant filed her petition with the intent to hinder, delay or defraud Plaintiff by concealing, removing, transferring, or destroying property of the estate; (2) that she knowingly made several false statements and accounts; and (3) that she failed to maintain adequate financial records. (Complaint, at 1–3). Plaintiff also alleged that its state court claim should be excepted from discharge because Defendant obtained money and property from Plaintiff through false pretenses, false representations, or actual fraud. (*Id.*).

16. Trial was held on July 8, 1997, August 6, 1997, and September 8, 1997.

## CONCLUSIONS OF LAW

A bankruptcy discharge permanently enjoins creditors from collecting debts protected by the discharge. A debtor is entitled to a discharge so long as the debtor has not engaged in fraudulent or improper activity in disclosing his or her financial condition to the Court. The terms for denying discharge are codified in § 727 of the Bankruptcy Code. 11 U.S.C. § 727 (1997).

Plaintiff contends that denial of Defendant's discharge is warranted pursuant to §§ 727(a)(2), (a)(3), and (a)(4). First, Plaintiff alleges that Defendant concealed her interest in property with the intent to hinder, delay, or defraud her creditors. Second, that Defendant deliberately omitted material information and provided false testimony during the pendency of her bankruptcy case. The third allegation is that Defendant failed to maintain adequate records which prevented her creditors from ascertaining her financial condition or business transactions. Plaintiff also seeks to except from discharge,

pursuant to § 523(a)(2)(A), its state fraudulent conveyance action against Defendant. The Court will now examine each of Plaintiff's allegations.

## Section 727(a)(2)(A)

Section 727(a)(2)(A) provides that the court is to grant a debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; . . . .

11 U.S.C. § 727(a)(2)(A) (1997).

Denial of discharge under § 727(a)(2)(A) requires the objecting party to show by a preponderance of the evidence:

(i) that a transfer occurred;

(ii) that the property transferred was property of the debtor;

(iii) that the transfer was within one year of petition; and

(iv) that at the time of the transfer, the debtor possessed the requisite intent to hinder, delay, or defraud a creditor.

*Mahon v. Milam (In re Milam)*, 172 B.R. 371, 374 (Bankr.M.D.Fla.1994). The requisite intent to hinder, delay, or defraud a creditor is satisfied upon a showing of actual, not constructive, intent. *Id.* Intent can be ascertained from the totality of the circumstances. *Id.* The Court has used the following "badges of fraud" to determine intent:

(a) the lack or adequacy of consideration;

(b) the family, friendship or close association between the parties;

(c) the retention of possession, benefit or use of the property in question;

(d) the financial condition of the party sought to be charged both before and after the transaction in question;

(e) the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt on set of

financial difficulties, or pendency or threat of suits by a creditor; and

(f) the general chronology of the events and transaction under inquiry.

However, where assets of some substantial value are omitted from a debtor's schedules, the conclusion that they were omitted with fraudulent intent may be warranted. *In the Matter of Galbraith,* 17 B.R. 302, 305 (Bankr. M.D.Fla.1982). Only when the nondisclosed assets are of little or no value will fraudulent intent not be presumed. *Id.*

### A. *Defendant's Failure to Disclose Ownership of 1987 Lincoln Continental*

 Plaintiff alleges that Defendant should be denied a discharge, pursuant to § 727(a)(2)(A), for failing to list a 1987 Lincoln Continental on her bankruptcy schedules. (Plaintiff's Ex. 2). At the § 341 creditors' meeting, held on September 17, 1996, Defendant admitted that she had failed to list the Lincoln on her schedules. (Plaintiff's Ex. 22, at p. 18). On December 16, 1996, Defendant amended her schedules to include the Lincoln. (Doc. 31). At trial, Defendant testified that she listed the Lincoln on a worksheet given to her attorney and that its omission from her schedules resulted from scrivener's error. (Tr. at 134).

Although the evidence shows that Defendant's original bankruptcy schedules failed to include the Lincoln, the Court finds that the omission was not intended to hinder, delay, or defraud her creditors. First, when questioned about the vehicle at the creditors meeting, Defendant readily disclosed her ownership of the Lincoln. (Plaintiff's Ex. 22, at p. 18). Second, Defendant later amended her schedules to include the vehicle. (Doc. 31). Third, evidence presented at trial established that Defendant had listed the Lincoln on a worksheet provided to her attorney and that its omission from her schedules was an error on her attorney's part. (Tr. at 134). Accordingly, the Court overrules Plaintiff's objection to discharge pursuant to § 727(a)(2)(A).

### Section 727(a)(4)(A)

 Section 727(a)(4) provides that a debtor shall be denied discharge if

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;....

11 U.S.C. § 727(a)(4)(A) (1997). This section focuses less on a debtor's physical attempt to conceal property of the estate, and more on a debtor's deliberate omission of information by giving false oaths or accounts regarding such property.

 Under § 727(a)(4)(A) discharge will be denied if the debtor made deliberate false oaths or omissions. *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984). Discharge will also be denied when the omission is fraudulent and material. *Id.* An oath or omission is material if what is left out "bears a relationship to the debtor's business transactions or estate or concerns the discovery of assets, business dealings or the existence and disposition of his property." *Id.* Although a single omission is generally insufficient to deny a debtor's discharge, a series of omissions, when examined together, "constitute a pattern that demonstrates the [d]ebtor made [a] false oath with a reckless disregard for the truth...." *In re Clawson,* 119 B.R. 851, 852–53 (Bankr.M.D.Fla.1990). "This reckless disregard for the truth is generally recognized as the equivalent to fraudulent intent." *In re Sausser,* 159 B.R. 352, 356 (Bankr.M.D.Fla.1993). Additionally, the debtor cannot circumvent § 727(a)(4)(A) by claiming that the omission concerns an item of zero or minimal value. *Chevy Chase Fed. Savings Bank v. Graham (In re Graham),* 122 B.R. 447, 451 (Bankr.M.D.Fla.1990). But, the Court can consider the value to determine the materiality of the omission and whether the debtor had the intent to deceive. *Id.* Of paramount importance is the veracity of the debtor's statements. *Milam,* 172 B.R. at 375.

### A. *Defendant's Undervaluation of Sayre–Ross Stock*

Plaintiff alleges that Defendant gave a false account of the value of the Sayre–Ross stock on her bankruptcy schedules. Plaintiff contends that Defendant is the 100% shareholder of Sayre–Ross and that her $10 valua-

tion of the stock was an intentional misrepresentation under § 727(a)(4)(A).

Defendant denies Plaintiff's claim that she is the sole shareholder of Sayre–Ross. Defendant claims that her stock is worth only $10 because Sayre–Ross' assets are outweighed by the enormity of its debts and she holds only 4.67% of the corporation's stock. Before determining whether Defendant deliberately gave a false account of the stock's value on her bankruptcy schedules, the Court will first determine whether Defendant is the sole shareholder of Sayre–Ross.

Ross testified that at the time Defendant filed her petition she was not the sole shareholder of Sayre–Ross. (Tr. at 18). Ross claimed that Defendant presently, and at the time of the petition filing, owns 500 shares and he owns 10,000 shares. (*Id.*). Defendant submitted a copy of the Minutes of Board of Directors Meeting, dated January 21, 1995, wherein Sayre–Ross purportedly issued Ross 10,000 shares of stock in the company. (Defendant's Ex. 16). The stated consideration for the issuance of the shares was payment for Ross' past and future engineering services and for his personal acceptance to pay a company debt.[1] (*Id.*) However, it should be noted that Defendant also claims that Sayre–Ross still owes Ross for both pre-petition and post-petition work.[2] (Tr. at 169.).

Further contradictory testimony was given with respect to Defendant's ownership of Sayre–Ross stock. Originally, Defendant denied knowledge of her percentage of ownership in Sayre–Ross.[3] (Plaintiff's Ex. 22, at p. 20). She also claimed no recollection of whether any other persons owned Sayre–Ross stock, only to later claim that Ross owns 10,000 shares. (*Id.*; Plaintiff's Ex. 21,

at p. 16–17). However, Defendant provided scant evidence to support her claim that she is no longer sole shareholder. She produced the January 21, 1995 Minutes to establish the claim's veracity, but failed to offer any corroborating evidence in the form of stock certificates, an original corporate resolution, or even an accompanying corporate minute book.[4] At the September 8, 1997 trial, Defendant informed the Court that her attempts to attain the corporate minute books and the original stock certificates were unsuccessful.

There is also evidence to suggest that the purported stock issuance would be in violation of Sayre–Ross' corporate charter. The corporate records indicate that Sayre–Ross is authorized to issue only 500 shares. (Plaintiff's Ex. 24). The records, consisting of the Written Consent of the Shareholders, Stock Subscription Agreement, and Stock Purchase and Redemption Agreement (all dated August 28, 1985), impose restrictions on the sale or assignment of Sayre–Ross common stock. The records also show that the stock is governed by § 1244 of the Internal Revenue Code and that it may not be transferred or assigned without an opinion of counsel that the transfer is not in violation of any state or federal securities law. Defendant failed to produce any documentation to show that the corporation did not violate its corporate charter when it purportedly issued 10,000 shares to Ross.

In the alternative, Plaintiff alleges that even if Ross did receive the 10,000 shares, there is no evidence that the receipt was supported by consideration. Ross testified that he received the shares for past consideration of the engineering and surveying work he had performed during Sayre–Ross' Chap-

---

1. The January 21, 1995 Minutes provide: "[t]he directors also agreed to pay Mr. Ross for his past and future engineering and survey work ...". (Defendant's Ex. 16).

2. This claim only serves to undermine Defendant's assertion that Ross was issued 10,000 shares in consideration for such work.

3. At the creditors' meeting, Defendant was asked what her percentage of ownership was in Sayre–Ross, to which Defendant replied: "I don't even know the percentage." (Plaintiff's Ex. 22, at p.

20). Whereas, during her deposition, Defendant was asked whether she had been the sole shareholder of Sayre–Ross at the time the corporation had filed for bankruptcy in August 1991. Defendant responded: "I might have been. I don't remember." (Plaintiff's Ex. 21, at p. 16).

4. At the trial, Defendant's response as to why the stock certificates had not been turned over to the Trustee was "I would have to make a special trip to Georgia. We haven't had enough time to do that." (Tr. at 110).

ter 11 bankruptcy. He also claimed that he received the shares in consideration of his personal guarantee to pay the Caviness mortgage.

Plaintiff makes three arguments to rebut Ross' claim that his receipt of the shares was supported by consideration. First, Plaintiff cites Defendant's testimony wherein she admitted that Ross "didn't pay anything for the stock issue." (Tr. at 121). Second, Plaintiff asserts that Ross is not personally obligated to repay the Caviness mortgage.

On May 5, 1994, Ross entered into an agreement with Caviness in which he agreed to pay her $135,000. However, the Agreement itself specifically states that "Sayre–Ross is to pay [Caviness]," and Ross signed the agreement not in his individual capacity, but as President of Sayre–Ross. (Defendant's Ex. 26). Despite the plain language of the Agreement, Ross claims that he was personally obligated to pay Caviness. Ross testified that Sayre–Ross obtained its final decree, upon consummation of the company's reorganization plan, with the understanding that Caviness was to receive full payment through either company or personal funds.[5]

Assuming Ross was personally obligated on the Caviness mortgage, Plaintiff claims that Ross' obligation was discharged in his personal bankruptcy case. Ross received his discharge on January 27, 1995, eight months after he signed the Agreement. Although there is no reaffirmation agreement in his personal bankruptcy case, Ross asserts that he never intended to be discharged from his obligation to pay Caviness. (Tr. at 20–21).

Plaintiff's third argument that Ross' receipt of the shares was not supported by consideration, is that Ross failed to file a claim during Sayre–Ross' Chapter 11 bankruptcy case and that the company's Plan of Reorganization did not provide for any payment to Ross. Consequently, Sayre–Ross owed him nothing when it came out of bankruptcy in 1994.[6]

The evidence establishes that Defendant is the sole shareholder of Sayre–Ross. Defendant failed to produce supporting documentation, including stock certificates, to establish the veracity of the January 21, 1995 Minutes. Further, Defendant did not produce documentation showing that such a stock issuance would not have been in violation of the corporate charter. Finally, Defendant's assertion that the corporation remains indebted to Ross contradicts the stated intent of the January 21, 1995 Minutes, which sought to relieve Sayre–Ross of that debt by granting Ross 10,000 shares. The questionable veracity of the January 21, 1995 Minutes combined with the lack of supporting documentation requires a finding that Defendant remains sole shareholder of Sayre–Ross. As such, the Court need not reach a determination on whether Ross' receipt of the shares was supported by consideration.

Having determined Defendant's shareholder status, the Court will now examine whether Defendant undervalued the Sayre–Ross stock on her bankruptcy schedules. In the

---

**5.** Upon further inquiry of the Court, Ross testified as follows:

> The Court: What was it that you felt that you needed to say to the judge in Atlanta who was handling the Chapter 11 case that would indicate that you would be responsible for paying Ms. Caviness the money she was owed?
>
> The Witness: Well, he had the two of us in front of him, and he talked about letting the corporation out the Chapter 11.
>
> Her son was also there, but he was not up in front of the judge. He was a professional engineer like myself and also an attorney.
>
> The company he worked for is run by one of my best friends, and I was their mentor. So, I had a very strong feeling to Ms. Caviness about not letting her down because I was mentor to

her son as an engineer, and to his boss who was also an engineer.

> The Court: But you are telling the judge that not only had the corporation stand good for her debt, but you will stand good for it also.
>
> The Witness: Yes, that is what he asked me, and that is what I told the judge.

(Tr. 59–60).

**6.** Although the 1996 corporate tax return for Sayre–Ross lists "current liabilities" to J.S. Ross & Associates in the amount of $22,800 for Phase 1, $29,000 for Phase II, $7,000 for Phase III and $41,500 for soil survey and septic tank plans, Ross admitted that a great deal of that work had been performed prior to the company's Chapter 11 bankruptcy case. (Plaintiff's Ex. 16; Tr. at 39).

event the Court finds that the stock was undervalued, it will then have to be determined whether that undervaluation was a knowing and fraudulent false account pursuant to § 727(a)(4)(A).

Plaintiff asserts that Defendant's Sayre–Ross stock is clearly worth more than $10 and premises its assertion on the corporation's ownership of lots 36 and 68 in the Lost Mountain Township development. (Tr. at 26). Plaintiff contends that the value of the two lots are $118,900 and provided copies of the Cobb County tax assessor's printouts in support of its valuation claim.[7] (Plaintiff's Ex. 7). During his deposition, Ross generally agreed with Plaintiff's valuation, testifying that, in his opinion, lots 36 and 68 are presently valued at approximately $90,000.[8] (Plaintiff's Ex. 15, at 15–17). The lots are currently listed for sale at $45,000 and $75,000 respectively. (Tr. at 21).

Defendant sought to establish that the value of the lots are outweighed by Sayre–Ross' debt obligations. Ross testified that in the event the two lots are sold, the proceeds would barely be enough to pay off the Caviness mortgage and any incidental expenses related to the sale.[9] (*Id.* at 69). Ross also claims that Sayre–Ross owes him reimbursement for the personal expenditures he made to pay the corporation's various debts, claiming a total expenditure of $10,001.72.[10] (*Id.* at 185). Ross contends some of these expenditures included payments for Sayre–Ross'

county taxes, the corporation annual registration for the State of Georgia, 1996 county taxes for the Homeowners' Association property owned by Sayre–Ross, and the Homeowners' Association dues for 1994 and 1995.

Supporting documentation, regarding Ross' claim that he expended personal funds to pay Sayre–Ross' debt obligations, is sparse. Defendant provided copies of two checks, written on Ross' personal joint account with Defendant, showing payments of $720.45 and $1310.13 for the 1996 county taxes on lots 36 and 68.[11] (Defendant's Ex. 19) Defendant also submitted a copy of check number 930, dated February 5, 1997, made payable to the Georgia Department of Revenue Income Tax Division in the amount of $45. This check was drawn on Ross' joint account with Defendant and indicates that the payment was made for the benefit of Sayre–Ross. (Defendant's Ex. 21).

Only one check, in the amount of $15, was submitted to establish that Ross paid for the corporation's annual registration to the State of Georgia.[12] (Defendant's Ex. 20). In lieu of check copies, copies of the annual registration statement were submitted with handwritten notations.[13] However, there is no indication whether the handwritten notations pertain to dates of payments and check numbers, or whose funds were used to make the payments. (*Id.*). Corroborating evidence can be found in Ross' testimony that he made

7. For the 1995 tax year, the tax assessor's report valued lots 36 and 68 at $42,400 and $76,500, respectively. (Plaintiff's Ex. 7).

8. Although the lots have percolation problems in trying to locate a septic tank, Ross testified that he believed that building permits can be obtained with the proper building plans. (Tr. at 176). Defendant provided no evidence to counter Ross' assertion that the lots are permitable. Ross also testified that the corporation received bids of $9000 for lot 36 and $20,000 for lot 68 at auction. Sayre–Ross declined both of those bids. (*Id.* at 178).

9. Caviness' claim is now valued at $25,422. (*Id.* at 70).

10. Ross cites lack of corporate funds as the reason for his use of personal funds to pay Sayre–Ross' debts. (*Id.* at 182–185).

11. Check number 1061 was made payable to Cobb County Tax Commissioner on June 24,

1997. Check number 1056 was made payable to Cobb County Tax Commissioner on June 18, 1997. (Defendant's Ex. 19).

12. The statement for the 1997 Corporation Annual Registration shows an amount due of $15 with a handwritten notation of "# 932" and "2/6/97". (Defendant's Ex. 20). A copy of check number 932, made payable to the Secretary of State of Georgia, in the amount of $15, was provided. Check number 932 was written on a joint account held by Ross and Defendant. (Defendant's Ex. 21).

13. The handwritten notation on the 1996 Corporation Annual Registration states: "check 1566" and "3/29/96". (Defendant's Ex. 20) The handwritten notation on the 1994 Corporation Annual Registration states: "# 1434" and "4/11/94". (*Id.*). Defendant did not submit a copy of the 1995 Annual Registration.

**328**

the annual registration payments for 1994 and 1996, and a one-page document, titled Expenses Paid by James S. Soss [sic] for Sayre–Ross Co (List), which purportedly lists all of the expenses paid by Ross for the benefit of Sayre–Ross.[14] (Tr. at 183; Defendant's Ex. 24). According to the List, Ross made the annual registration payments for the years 1994, 1995, 1996, and 1997, totaling $60. (Defendant's Ex. 24).

Ross also claims that he paid the 1996 county taxes on the Homeowners' Association property owned by Sayre–Ross. In support of this claim, Defendant submitted a copy of a Corrected Tax Statement, Cobb County, Georgia, For Tax Year 1996, reflecting an amount due of $183.35.[15] However, Defendant did not submit a check copy, or any other evidence to show that Ross used personal funds to pay those taxes. Again Ross' testimony and the List are the only corroborating evidence that Ross used personal funds to pay the 1996 county taxes on the Homeowners' Association property. (Tr. at 183; Defendant's Ex. 24).

With respect to Ross' claim that he paid the Homeowners' Association dues for years 1994 and 1995, Defendant submitted a copy of the Association assessment which indicates an amount due of $400 for each year. (Defendant's Ex. 23). Again, Defendant did not submit check copies to show that Ross, and not the corporation, made those payments. However, the List indicates that Ross used

personal funds to pay the Association assessments. (Defendant's Ex. 24).[16]

Defendant also cites Sayre–Ross' debt obligation to pay Ross his fees for work performed on behalf of the corporation. Sayre–Ross' 1996 corporate tax return lists current liabilities to Ross in the amount of $22,800 for Phase I, $29,000 for Phase II, $7000 for Phase III, and $41,500 for soil survey and septic tank plans.[17] (Plaintiff's Ex. 16). However, Ross admitted that he completed Phase I and II prior to Sayre–Ross' Chapter 11 filing. He further admitted that when the corporation came out of bankruptcy Sayre–Ross owed him nothing.[18] (Tr. at 29). With respect to Ross' work involving soil surveys and septic tank plans, he acknowledged that some work had been completed pre-petition, but insisted that he had also performed post-petition work. (Id. at 41). Neither Ross nor Defendant clarified what lots Ross had performed post-petition soil surveys and septic tank plans.[19] Additionally, Ross could not recall whether his work for Phase III had been performed post-petition or pre-petition.[20] (Id. at 39).

After evaluating all of the evidence, the Court finds that Defendant's $10 valuation of the Sayre–Ross stock was a serious miscalculation. Defendant failed to satisfactorily establish that Sayre–Ross is indebted to Ross for his work on all three phases of the Lost Mountain Township development.

14. The List indicates that Ross made payments totaling $6,001.72, and that an additional $4000 was estimated for 1997 expenses (taxes and legal fees). (Defendant's Ex. 24). One unaccounted expense that shows up on the list pertains to a 17.9 acre variance in the amount of $450. (Id.). The Court could find no other evidence or testimony to establish or explain that expenditure.

15. The List shows that Ross purportedly paid the 1995 taxes on this property in the amount of $1,532.79. However, he did not testify to making that specific payment, he only testified that the List is a copy of all the bills he paid on behalf of Sayre–Ross. (Defendant's Ex. 24; Tr. at 185).

16. The List also indicates that Ross made a payment of $900 for the 1993 assessment, which results in a total expenditure by Ross for the Association assessments of $1,700.00. (Defendant's Ex. 24).

17. Defendant submitted the copy of an invoice dated October 7, 1996 that lists Ross' soil survey

and septic tank work in the amount of $41,500. (Defendant's Ex. 8).

18. Ross testified that the work for Phase I and Phase II was performed before Sayre–Ross petitioned for Chapter 11 bankruptcy relief. (Tr. at 36–39). Additionally, all of the aerial topographical surveys for both Phase I and II were completed prior to Sayre–Ross' filing for Chapter 11 bankruptcy protection. (Id. at 42).

19. The record does reflect that four remaining lots were owned by Sayre–Ross when it came out of bankruptcy—lots 36, 59, 62, and 68. (Id. at 38).

20. When asked whether the Phase III work had been performed pre-petition, Ross responded: "No, I think a good deal of that well could be. I don't know." (Tr. at 39).

The Court also notes that evidence regarding the corporation's debt to Ross for his purported personal expenditures of $10,001.72, made on behalf of Sayre–Ross, is inconclusive. However, the Court need not establish the exact amount, if any, owed to Ross for those personal expenditures. Such an examination is unwarranted because whether Sayre–Ross owes Ross those funds or not, the evidence still shows that Defendant undervalued the Sayre–Ross stock. Taking into account Sayre–Ross' debt, including Mrs. Caviness' claim of around $26,000, Ross' personal expenditures of $10,001.72, and any other incidentals, and comparing that with Sayre–Ross' property holdings which range in value from $90,000 to $118,900, the Court concludes that Defendant's $10 valuation of her shares on her bankruptcy schedules was in error.

The more difficult question is whether Defendant's valuation was a knowing and fraudulent false account. Defendant is the sole shareholder of Sayre–Ross, a corporation that has an interest in two parcels of property valued in excess of its debt obligations. Under those circumstances, the Court finds that Defendant could not have believed in the veracity of her $10 valuation on her bankruptcy schedules. Accordingly, the Court holds that Defendant knowingly and fraudulently undervalued the Sayre–Ross stock.[21]

### B. Disposition of Sale Proceeds for Lots 59 and 62

Plaintiff also alleges that Defendant gave a knowing false account of her interest in proceeds relating to the sale of two lots owned by Sayre–Ross pursuant to § 727(a)(4)(A). On February 29, 1996, Sayre–Ross sold lot 62 for $47,500, and on July 22, 1996, lot 59 was sold for $52,500. (Plaintiff's Ex. 14). Total net proceeds from those sales was $78,949.[22] (Plaintiff's Ex. 16). Sayre–Ross' 1996 tax return (1120 S Form) shows that costs relating to the sale

totaled $75,145. (Defendant's Ex. 2). The tax return also shows that the corporation reduced its shareholder loans by $3096, with Sayre–Ross earning a net income of $581.00. (Id.).

Although Defendant does not dispute having had knowledge of the shareholder loan reduction at the time she filed her petition, Defendant denies having actually received the funds, testifying that "I think it went to pay taxes on the other property. Certainly none of it went into our pockets." (Tr. at 127). Contradictory testimony was given by Ross who testified that the shareholder loan reduction represented a reimbursement to him for his payment of attorney's fees during Sayre–Ross' Chapter 11 bankruptcy. (Id. at 173–74). However, because Defendant has remained the sole shareholder of the corporation, Ross could not have been the beneficiary of the shareholder loan reduction.

The question remains whether Defendant's false account was a deliberate omission. The omission is material because it bears a relationship to Defendant's business transactions and concerns the discovery of her assets. See Chalik, 748 F.2d at 618. Because Defendant knowingly omitted material information concerning the discovery of property of the estate, the Court holds that Defendant's failure to list the shareholder reduction was a false account pursuant to § 727(a)(4)(A).[23]

### C. Disposition of Sale Proceeds for Lots 43 and 44

Plaintiff also contends that Defendant failed to disclose or account for the disposition of proceeds from the sales of lots 43 and 44 located in Lost Mountain Township. (Complaint, Ex. D). In June 1989, Sayre–Ross deeded to Defendant Lots 41, 43, and 44. In May 1992 and March 1993, Debtor sold Lots 43 and 44. Defendant's Answer admits to the receipt of the properties, but contends that because the sale of the two lots occurred more than one year prior to the

---

21. As discussed *infra*, the Court notes that Defendant has engaged in a pattern of omissions or false accounts, casting further suspicion on her $10 valuation of the stock.

22. Defendant filed for bankruptcy on August 5, 1996.

23. Again, the Court's holding is supported by Defendant's numerous omissions which demonstrate her reckless disregard for the truth. *See infra*. Her reckless disregard for the truth can be considered equivalent to fraudulent intent. *See Sausser*, 159 B.R. at 356.

filing of her bankruptcy petition, she was not obligated to disclose the disposition of the proceeds on her schedules. (Answer, at 4.e.).

It is uncontroverted that the lots were sold beyond one year of Defendant's bankruptcy filing, thus the Court concludes that Defendant was under no obligation to account for the proceeds from those sales. Consequently, Defendant did not give a false account on her bankruptcy schedules regarding her interest in the proceeds pursuant to § 727(a)(4)(A).

### D. *False Statements Made During Pendency of Bankruptcy Case*

▉ Plaintiff's final allegation regarding denial of discharge pursuant to § 727(a)(4)(A) pertains to false statements Defendant made during the pendency of her bankruptcy case, including the following: (1) her denial of owning any airplanes within the past 10 years; (2) her assertion that Sayre–Ross owned no real estate and became inactive a long time ago; and (3) her testimony regarding her level of participation in the business of Sayre–Ross and Lind–Aire.

At the § 341 creditors' meeting, Defendant testified that she last owned an airplane, a Cessna 172, about 10 years ago. (Plaintiff's Ex. 22, p. 15). She also testified that she sold the airplane, but was unclear as to who bought the Cessna 172. "To a company. I don't know. I guess it was just an individual, you know, someone who came from out of state bought it." (Plaintiff's Ex. 22, p. 15). The evidence refutes her testimony that she acquired the airplane 10 years ago, showing that she inherited the Cessna upon her father's death in 1993. (Plaintiff's Ex. 21, p. 53). Evidence further established that Defendant later sold the Cessna 172 to Lind–Aire for $15,000, a corporation in which she was an officer. (Plaintiff's Ex. 21, p. 53).

The sale took place on May 25, 1995. (Plaintiff's Ex. 14).

Defendant also testified at the creditors' meeting that Sayre–Ross owned no real estate and that it does not act as a broker for sales of real estate. Additionally, she stated that the corporation is not in active status and that it became inactive "[a] long time ago." (Plaintiff's Ex. 22, p. 19). However, as previously discussed, Sayre–Ross still owns two lots, both of which are currently on the market awaiting a prospective buyer. Therefore, her claim that the corporation does not own any real estate, and that it is not an ongoing enterprise, is a falsehood.

Moreover, Defendant provided contradictory statements regarding her involvement in Sayre–Ross and Lind–Aire. Initially, Defendant could not recollect whether she had ever been an officer of Sayre–Ross.[24] (Plaintiff's Ex. 21, at p. 17). However, after further questioning, Defendant did admit to serving as Secretary of Sayre–Ross from 1992 through 1996. (*Id.*). While being deposed, Defendant stated that she has "nothing to do with Lind–Aire." (Plaintiff's Ex. 21, p. 46).[25] But, during the trial, Defendant testified that she has been serving as Secretary of Lind–Aire since June 1, 1996. (Tr. at 132).

Although it is not clear whether Defendant deliberately made these false statements, the Court finds that she has engaged in a pattern of omissions and false accounts. This pattern is evidenced in not only the discrepancies noted above, but also in her failure to include the shareholder loan reduction on her schedules, as well as her undervaluation of the Sayre–Ross stock. These omissions and false accounts lend credence to the conclusion that Defendant has engaged in a pattern of wrongful conduct with a reckless disregard for the truth. *See Clawson,* 119 B.R. at 853. Having established that Defendant acted with a reckless disregard for the truth, the

---

**24.** Defendant was asked the following about her professional association with Sayre–Ross:
Question: Were you ever an officer of the Sayre–Ross Company?
Answer: I might have been.
(Plaintiff's Ex. 21, at 17).

**25.** She did admit, however, to having been President of the company at the time of formation. (Tr. at 47). She also admitted that as of December 31, 1995 she had been President. (*Id.* at 49). When asked whether she continued to hold that position, she responded "I am no longer the president of the company." (*Id.* at 48). Although, Defendant could not pinpoint the exact time of her resignation, she stated that as of June 1, 1996, she was no longer serving as President of Lind–Aire. (*Id.* at 50).

Court finds that Defendant acted with fraudulent intent. *See Sausser*, 159 B.R. at 356. Accordingly, the Court holds that Defendant knowingly and fraudulently gave several false oaths and accounts. Therefore, the Court sustains Plaintiff's objection to discharge pursuant to § 727(a)(4)(A).

**Section 727(a)(3)**

Plaintiff cites as a third ground for denying Defendant discharge § 727(a)(3). Section § 727(a)(3) provides that the court is to deny discharge if:

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case; ....

11 U.S.C. § 727(a)(3) (1997).

The objecting party bears the burden of proving that a debtor's financial records are inadequate. *Milam*, 172 B.R. at 375. Although a debtor need not give a full accounting of every business transaction, the debtor should have written records from which her past and present financial condition can be ascertained with substantial completeness and accuracy. *Id.* A debtor's discharge will not be denied where production of corporate financial records is inadequate, because the failure to keep records must be based on a debtor's personal financial records. *In re More*, 138 B.R. 102, 105 (Bankr. M.D.Fla.1992). But, if the debtor has extensive business dealings, the debtor "should have extensive records from which her financial condition [can] be ascertained." *Messing v. Urban*, 130 B.R. 340, 345 (Bankr.M.D.Fla. 1991).

**A.** *Failure to Provide Adequate Records of Sayre–Ross and Lind–Aire*

Plaintiff claims that its efforts to determine Defendant's ownership interest in Lind–Aire has been thwarted by Defendant's failure to provide adequate corporate records. Defendant denies any ownership interest in Lind–Aire, testifying that her daughter, Catherine Ross Hoeft (Hoeft), owns 100 percent of Lind–Aire's stock. (Plaintiff's Ex. 21, at p. 58). She also claims that Hoeft was the original sole shareholder of the company. (*Id.* at 59). At the trial, Ross gave corroborating testimony, stating that Defendant never owned any stock in Lind–Aire. (Tr. at 63). He also testified that Defendant never received any salary in connection with her position as an officer of the company. (*Id.* at 64).

Evidence submitted by Plaintiff shows that Lind–Aire received its certificate of incorporation on May 25, 1994 and that Hoeft received 500 shares of Lind–Aire stock on May 28, 1994. (Plaintiff's Ex. 25). Plaintiff provided no evidence that Defendant had an ownership interest in Lind–Aire within one year of her bankruptcy filing. Plaintiff claims that this lack of evidence stems in large part from Defendant's failure to turn over Lind–Aire's corporate records, particularly the minutes of any meetings. In fact, the Court continued the August 6, 1997 trial to September 8, 1997 to give Defendant the opportunity to procure these records. However, at the September 8, 1997 trial, Defendant informed the Court that Hoeft, who maintains the original corporate records and resides in Arizona, has refused to turn them over to Defendant.

A similar problem was faced by Plaintiff with respect to Defendant's ownership interest in Sayre–Ross. As discussed previously, Defendant failed to produce stock certificates or complete minutes books for either the Shareholder or Directors meetings.[26] After continuing the August 6, 1997 trial, the Court informed Defendant of her responsibility to produce the corporate records of Sayre–Ross and Lind–Aire:

> The Court: It seems to me that we are playing a lot of games here that we do not need to play, and the Debtor

**26.** Ross claimed that Sayre–Ross's Chapter 11 bankruptcy attorney, Lee Alexander, had the corporate records. (Tr. at 189). However, Mr. Alexander filed an Objection to Subpoena Duces Tecum, on July 28, 1997, certifying that he does not have, and never had, Sayre–Ross' corporate records. (Doc. 14).

has a responsibility of producing records, and I suggest to her that in the interval not only with Mr. Alexander, but she might want to communicate with her daughter and get whatever she has and get in everything that she has that she can touch, so there is no problem. She is just allowing a lot of things to be raised here that she can put to rest if she gets all the things together.

(Tr. at 208). However, when the Court convened the September 8, 1997 trial, Defendant informed the Court that the records for Sayre–Ross and Lind–Aire could not be located.

Although the records are of a corporate, rather than a personal nature, Plaintiff maintains that Defendant's personal financial condition cannot be ascertained. Plaintiff also claims that Defendant is sufficiently sophisticated in business matters such that she should be held to a higher level of accountability. Plaintiff points to Defendant's positions as Secretary of Sayre–Ross and now Lind–Aire, as well as her previous position as President of Lind–Aire. Plaintiff also cites Defendant's business experience while working for Ross' engineering firm from at least 1975 through 1990, where she handled the company's accounts payables and receivables. (Tr. 92). Accordingly, Plaintiff claims that Defendant's failure to produce the corporations' records is sufficient to deny her a discharge under § 727(a)(3).

It is uncontroverted that Defendant's failure to produce the corporate records has impeded Plaintiff's efforts to determine Defendant's ownership interest in both Lind–Aire and Sayre–Ross. It is equally clear that Defendant is no stranger to business transactions or maintaining financial records. Therefore, the Court finds that Defendant had a duty to preserve and maintain corporate records wherein she held positions of authority, such that her creditors could ascertain her financial condition and her business transactions. Accordingly, the Court holds that Defendant should be denied a discharge pursuant to § 727(a)(3).

Having decided that Defendant's discharge should be denied pursuant to §§ 727(a)(3)

and (a)(4)(A), the Court need not address whether Plaintiff's state court claim should be excepted from discharge pursuant to § 523(a)(2)(A).

## CONCLUSION

Plaintiff has not established a basis for denying Defendant's discharge under § 727(a)(2)(A). However, Plaintiff has shown by a preponderance of the evidence that Defendant's discharge should be denied pursuant to §§ 727(a)(3) and (a)(4)(A). As a result, it is unnecessary, for the Court to determine whether Plaintiff's state court claim should be excepted from discharge under § 523(a)(2)(A). The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.